JOURNAL ENTRY AND OPINION
Plaintiff-appellant, GMS Management Co., Inc., appeals the judgment of the trial court following a bench trial finding defendants-appellees, Albert Dattilo, James A. Baker, III and Sabrina Baker not liable on appellant's breach of contract claims. Defendant-appellee Albert Dattilo cross-appeals the trial court's decision denying him judgment on his counterclaim against appellant for lost profits.[1] For the reasons that follow, we affirm.
I. Facts and Procedural History
The record reflects the following facts pertinent to this appeal. Appellant is the landlord of the Shaker Moreland Shopping Center. On February 1, 1994, appellant and Bubba's Q, Inc., an Ohio corporation formed by defendants-appellees James and Sabrina Baker, entered into a lease agreement whereby Bubba's Q agreed to lease space in the Shaker Moreland Shopping Center for the operation of a barbecue restaurant. The lease was for a period of five years, commencing on June 1, 1994 and terminating on May 31, 1999. On May 3, 1996, Bubba's Q, with the consent of appellant, assigned the lease to defendant-appellee Albert Dattilo, who also intended to operate a barbecue restaurant in the space. In conjunction with the assignment, the Bakers signed a "Continuing Guarantee", personally guaranteeing the terms of the lease.
After Bubba's Q vacated its space at the Shaker Moreland Shopping Center, Dattilo had continuing problems with water leaking in through the ceiling. Because of these problems, appellant abated the rent charged to Dattilo for the months of July and August 1996. When appellant failed to correct the leakage problem, Dattilo vacated the space in September of 1996.
On October 31, 1996, appellant filed a six-count complaint against appellees, seeking unpaid rent for the balance of the lease term, monies extended for repairs, attorneys' fees and other monies allegedly due pursuant to the lease. Appellant alleged that pursuant to the lease assignment, Dattilo was liable for the lease obligations. Appellant also alleged that pursuant to their guarantee, the Bakers were similarly liable for the lease obligations.
Dattilo filed an answer and counterclaim for lost profits, alleging that appellant had failed to deliver the premises in an habitable condition. Specifically, Dattilo alleged that appellant's failure to fix the leaky roof over the leased space had made it impossible for him to open and operate a restaurant on the premises. The Bakers also filed an answer and a counterclaim against appellant, alleging that appellant had misrepresented the condition of the roof to them and breached the lease by failing to provide a premises reasonably suited for the purpose for which it was leased and failing to repair the premises. In addition to compensatory damages, both appellees sought punitive damages from appellant. Both appellees also filed cross-claims for indemnification against each other.
On March 25, 1997, appellant filed a motion for judgment on the pleadings, seeking judgment in its favor regarding appellees' counterclaims. The trial court granted appellant's motion in part, striking appellee Dattilo's demand for punitive damages. The trial court overruled the remainder of appellant's motion.
Subsequently, the trial court also denied appellant's motion to strike appellees' jury demand. Appellant sought a writ of mandamus compelling the trial court to strike appellees' jury demand and a writ of prohibition prohibiting the trial court from proceeding with a jury trial from the Supreme Court of Ohio. The Supreme Court denied both writs.
On April 29, 1998, appellant filed a motion for summary judgment. On July 28, 1998, the trial court, without opinion, denied appellant's motion.
The case proceeded to trial on November 23, 1998. Immediately prior to trial, appellees waived their demand for a jury trial and, accordingly, the case proceeded to a bench trial.
Appellant called three witnesses. Patricia Morgan, the bookkeeper and supervisor of records for GMS, testified that based on her interpretation of the lease agreement, appellees owed $55,677.67 in unpaid rent and other monies allegedly due pursuant to the lease. She also testified that appellant paid $17,419.13 in various repairs to the premises, for which appellees were liable. Morgan did not identify what the repairs were for, however, or testify regarding the necessity of the repairs, who performed the repairs or when the repairs were done. On cross-examination, Morgan admitted that she had no personal knowledge regarding whether the repairs were actually completed; she knew only that invoices concerning repairs to the premises had been paid.
Steven Eisenberg, a licensed real estate agent employed by Arnold J. Eisenberg, Inc., testified for appellant that in December 1996 his firm placed a new tenant, Royal Novelty, in the space formerly occupied by Bubba's Q, and that GMS paid him a commission in the amount of $4,320 for doing so.
Appellant's third witness, Patricia Neubert, testified that she began working as a commercial property assistant at GMS in January 1997 and was responsible for the Shaker Moreland Shopping Center. Neubert testified that in response to "numerous complaints" from various tenants at the Shaker Moreland Shopping Center regarding leaks in the roof, she arranged for various repairs to the parking deck of the shopping center, which covers most of the units in the shopping center, including the unit formerly occupied by Bubba's Q and Dattilo.
Neubert also testified that shortly after she began working for GMS, she examined the ceiling in the space formerly occupied by Bubba's Q and observed water damage on the ceiling in the area where Bubba's Q had installed ventilation ducts to exhaust various emissions from the restaurant. Neubert hired Advanced Roofing to put flashing around the ducts where they penetrated through the parking deck of the shopping center. When the new flashing failed to stop the leaks, Neubert hired Geotech Services, Inc. to remove the ventilation ducts, install light-weight concrete in the holes and seal them. Neubert testified that these repairs did not fix the leakage problem, however, and she subsequently received complaints from Royal Novelty, the tenant that ultimately succeeded Bubba's Q, concerning water leaks in the roof. According to Neubert, the leak in the space was finally fixed when appellant hired a contractor to install drainage pans and pipe in the ceiling to catch and drain the water that was still leaking into the roof.
On cross-examination, Neubert admitted that the water leakage problem in the roof of the Shaker Moreland Shopping Center was still not fixed, however, and that as recently as two weeks prior to trial, she had received a complaint from Market on the Square, a grocery store located in the shopping center, regarding water leaking through its ceiling.
Neubert also admitted that she had no personal knowledge regarding the water problems in Bubba's Q before she began working for GMS in January 1997. She acknowledged that there are several items in addition to the ventilation units installed by Bubba's Q that penetrate the parking deck, including heating and cooling units over several tenant spaces, fencing around the roof and a small house on the parking deck that is used for storage of maintenance supplies. Neubert testified that the water leaking into the former Bubba's Q space appeared to be leaking in only around the ventilation ducts in the ceiling, but acknowledged that she did not know whether the water leaked into the ceiling through the penetrations in the roof caused by the ventilation ducts or whether it leaked through penetrations in the roof caused by the other items on the roof and then migrated through the interior of the roof into Bubba's Q, causing a leak.
The Bakers called seven witnesses. Stuart Graines testified that he is presently general counsel for GMS and has been "associated" with the company for approximately twenty years.[2]
Graines testified that the lease between GMS and Bubba's Q, the original tenant, was a commercial, boiler-plate lease entered into with "very little negotiation" between the parties. Graines admitted that he was aware of water leakage problems at the Shaker Moreland Shopping Center occurring after 1994, including leaks at Market on the Square, but insisted that the leaks started after Bubba's Q hired a contractor to install ventilation units that penetrated the parking deck of the shopping center.
Gregory Simon, the owner of Design Construction and Roofing, testified that he has been in the roofing business for over twenty years. Simon testified that he was hired by GMS in 1992 to fix leaks in the parking deck of the Shaker Moreland Shopping Center. Simon estimated that over the next two years, he worked on the parking deck on approximately thirty to forty occasions. According to Simon, he made many repairs to the roof, but informed appellant that the repairs were "just band-aids" and that the entire roof needed to be replaced because it "was completely gone".
Simon testified that in addition to fixing the guardrail on the roof, he repaired the flashing around the small house on the roof in an attempt to fix the leakage problem. According to Simon, "There was leakage in several areas. To correct it, you had to flash about everything because the whole flashing was bad, so many feet of it, and there was water coming in all over. * * * Market on the Square had leakage. Several units had leakage. Radio Shack had leaks. I could go on for you. * * * There is a unit, it is a dry clean place store. They had a lot of leaks in there I had to fix."
Simon testified that the parking deck was comprised of a layer of concrete, a layer of "roofing felt", which is approximately three inches thick, and a layer of asphalt. According to Simon, it was very difficult to pinpoint the source of the leaks because the roof is layered. Simon testified that water would seep into the interior space of the roof through cuts in the roof, and then migrate down through the layers of the roof, eventually leaking through the ceiling of the leased spaces below, many feet away from where the water originally entered the roof.
On recall for further cross-examination, Steven Eisenberg testified that when he took Dattilo through the space in the spring of 1996, the roof was "noticeably leaking" and there was water on the floor. Eisenberg testified further that due to the water leakage problem, it would have been impossible for Dattilo to open a restaurant in the space.
The Bakers then adduced the testimony of Sally Muth, who was employed by GMS as a property manager for the Shaker Moreland Shopping Center from July 1995 through September 1996. Muth recalled receiving complaints from various tenants in the shopping center regarding water leaking through the roof. Muth testified that the parking deck was resealed in response to these complaints but in July 1996, Dattilo advised her that the roof was still leaking. Muth acknowledged that in addition to the vents installed by Bubba's Q, there were other fixtures that protruded through the parking deck of the shopping center.
William Gallagher, the owner of Buckeye Sealcoating, a pavement maintenance contractor, testified that in 1996, appellant asked Buckeye Sealcoating to stop the water leaking into the ceiling of the space formerly occupied by Bubba's Q. Gallagher testified that he examined the roof, and in a letter dated July 31, 1996 to Sally Muth, advised appellant that, "[T]he water leakage at this facility does not appear to be coming from the immediate vicinity of the vent penetrations. These penetrations appear to be adequately sealed off, with no cracks or openings in the sealant material." Gallagher testified further that he observed the roof shortly after it had rained, and saw "small puddled areas, not very deep, but everywhere," in addition to numerous small cracks in the asphalt. Gallagher testified that he recommended that appellant first attempt to reseal the cracks, and if that were not successful, grind the asphalt away, repair the drains, slope the roof with lightweight concrete, install an impermeable membrane and pave the deck with new asphalt. According to Gallagher, Buckeye Sealcoating resealed the cracks on the surface on the parking deck, but appellant subsequently advised him that the resealing had not solved the water leakage problem.
Joseph Collota testified that he has been the store manager at Market on the Square in the Shaker Moreland Shopping Center for approximately thirteen years. According to Collota, Market on the Square had problems with water leaking through the ceiling every spring from 1992 until 1998, when the parking deck was resurfaced. Collota testified that he complained to appellant about the leaks every year and appellant would "patch" the roof to fix the leaks. Collota testified that the constant leaking created such a large hole in the ceiling of Market on the Square that in 1997, he finally attached a large sheet to the hole to funnel the water from the ceiling into a fifty-five gallon drum. Collota testified that appellant finally fixed the leaking problem and the hole in the ceiling of the store in May 1998 after the Health Department issued a complaint about the condition.
James Baker testified that he is the owner of Bubba's Q, Inc. Baker testified that before signing the lease with appellant, he and Eisenberg discussed the need for Bubba's Q to install a ventilation system in the space to filter and vent out various gases from the restaurant. According to Baker, after the lease was signed in early 1994, he attempted several times to obtain permission from appellant to penetrate the roof to install the ventilation system. When Baker advised Eisenberg that appellant was unresponsive, Eisenberg gave Baker permission to install the ventilation system.
Baker testified that when the contractor he had hired to install the ventilation system in Bubba's Q cut through the drop ceiling, he found a bucket, full of water that had leaked through the roof, in the ceiling. When the contractor made another hole in the ceiling, "water started gushing in * * *." According to Baker, water drained from the ceiling for three days. When the draining finally stopped, the contractor completed installation of the ventilation system.
Baker testified that during the two years he operated Bubba's Q, the ceiling leaked around the ventilation hoods when it rained. According to Baker, appellant did not respond to his frequent complaints regarding the leaks, so he finally wrapped foam around the ducts to absorb the water.
Baker testified that in December, 1995, he decided to close the restaurant because of the long hours required for its operation. Because there were still three years remaining on the lease, Baker asked Eisenberg to try to negotiate a settlement on the lease with Graines. When Graines refused Baker's settlement offer, Eisenberg offered to help Baker find a replacement tenant.
Baker testified that when he advised appellant in a telephone call that he had a possible replacement tenant, but the tenant was concerned about the visibly leaking ceiling in the space, appellant informed him that it would fix the leak.
Appellee Dattilo testified on his own behalf. Dattilo testified that in January, 1996, when he met Eisenberg at the space formerly occupied by Bubba's Q, "the whole place looked like it was raining inside". According to Dattilo, Eisenberg told him that the leak "would be taken care of". Later, on May 1, 1996, when Dattilo met Eisenberg and Baker at the premises to sign the lease assignment, Dattilo observed that the ceiling was still leaking and told Eisenberg that he wanted an assurance that the leak would be fixed. Eisenberg allegedly told Dattilo that if Baker did not fix it, "the building owner would take care of it". Dattilo testified that the water leakage problem was never fixed, however, and consequently, he was not able to open and operate a restaurant on the premises.
Dattilo authenticated a videotape recording he made in September 1996 of the space in the Shaker Moreland Shopping Center he had agreed to lease. The videotape showed standing water on the floor of the space and water dripping through the ceiling around the ventilation ducts. The videotape also showed puddles of water on the parking deck, although there was no water on the deck around the ventilation ducts installed by Bubba's Q.
Dattilo testified that he estimated that one thousand to fifteen-hundred people came into Market on the Square daily. Based on this traffic, a discussion with Baker regarding the amount of sales made by Bubba's Q and his knowledge of the volume of business in his other restaurant, Dattilo estimated that the restaurant he intended to operate in the Shaker Moreland Shopping Center would have realized a yearly profit of $250,000 to $275,000.
The trial judge rendered judgment in favor of appellees on appellant's breach of contract claims, finding that appellant had not met its burden of proof at trial. The trial judge found in favor of appellant, however, on appellee Dattilo's counterclaim for lost profits and on the Bakers' counterclaims for fraud and breach of contract. In rendering its verdict, the trial judge found that the Bakers had signed a personal guarantee that made them personally liable for the lease obligations. The trial judge further found, however, that "the video showed the deplorable * * * disastrous conditions on the premises that [were] a breach of * * * the covenant of quiet enjoyment. That property was not habitable." In addition, the trial judge stated:
 The Court is of the opinion that the problem with this roof preceded the Baker tenancy, obviously precedes Dattilo. * * *
 This whole case has been a complete waste of time and money on the part of everybody. It all goes back to a bad roof. You can't have a building, whether it be commercial or residential, without a proper roof.
 This roof * * * was deplorable. It was a disaster and caused all the problems for these people.
Appellant timely appealed, apparently assigning five assignments of error for our review.[3] Appellee Dattilo cross-appealed, assigning one assignment of error.
II. Appellant's Assignments of Errors
Appellant's first assignment of error states:
 I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO AWARD JUDGMENT TO PLAINTIFF[-]APPELLANT ON THE ISSUE OF LIABILITY FOR UNPAID RENT BECAUSE:
 A. CONTRARY TO THE COURT'S FINDING THAT "I DON'T THINK ANYBODY PROVED ANYTHING AND I AM GOING TO LEAVE EVERYBODY RIGHT WHERE THEY ARE OR WHERE THEY WERE WHEN THEY CAME TO THIS COURT . . .," [P. 1237; L. 9] PLAINTIFF PROVED ITS DAMAGES EQUALLING (SIC) UNPAID RENTAL OBLIGATIONS.
In its first assignment of error, appellant contends that the trial court erred in not awarding it judgment on the issue of unpaid rent because Dattilo's Answer to the Complaint admitted the non-payment of rent and, at trial, appellant's bookkeeper testified regarding the amount of rent due pursuant to the lease. Accordingly, appellant contends, the trial court was compelled to award judgment in its favor regarding its claim for unpaid rent. We disagree.
Dattilo's admission that the rent was not paid was not an admission that he was liable for the rent due. Rather, Dattilo's Answer to appellant's Complaint asserted that the rent had not been paid because appellant had materially breached the lease agreement. Thus, rather than conceding liability, Dattilo's Answer raised factual and legal issues regarding the parties' performance of the lease agreement that the trial court was required to resolve before determining whether appellees were liable for the unpaid rent. Accordingly, Dattilo's admission and Morgan's subsequent testimony regarding the amount of rent allegedly due pursuant to the lease agreement did not compel judgment in appellant's favor.
Appellant's first assignment of error is overruled.
Appellant's second assignment of error states:
 II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO AWARD JUDGMENT TO APPELLANT[,] APPELLEES HAVING FAILED TO ESTABLISH VALID DEFENSES TO THE REN[T]AL OBLIGATIONS BECAUSE:
A. THE COMMERCIAL PREMISES WERE ACCEPTED "AS IS".
 B. THE WATER ENTERED THE PREMISES ONLY THROUGH THE ROOF PENETRATION MADE BY APPELLEES, RENDERING APPELLEES SOLELY LIABLE FOR THE REPAIR AND ALL CONSEQUENCES THEREOF.
 C. EVEN WERE THE INCOMING WATER MIGRATING FROM ELSEWHERE, THE PREMISES WERE ACCEPTED "AS IS".
 D. THE REMOTE SOURCE OF THE WATER MAY ONLY BE PROVEN BY EXPERT TESTIMONEY (SIC), FOR WHICH:
 i) NO EXPERT REPORT WAS SERVED, FILED AND THEREFORE, DOCKETED AS REQUIRED BY LOC.R. 21.1(A) (B), AND CIV.R. 5(D); AND
 ii) NO WITNESS WAS QUALIFIED AS AN EXPERT [E.G., TR. 456 698].
E. THE PARTIES WERE OF EQUAL BARGAINING POWER.
F. THE LEASE WAS UNAMBIGUOUS AND DRAFTED BY BOTH PARTIES.
 G. A LANDLORD HAS NO DUTY TO CONVEY HABITABLE COMMERCIAL PREMISES.
 H. APPELLANT DID NOT CONVEY THE PREMISES TO APPELLEE DATILLO BECAUSE POSSESSION WAS CONVEYED BY THE CORPORATE TENANT OF WHICH APPELLEE AL BAKER WAS THE PRINCIPAL.
 I. APPELLANT DID NOT BREACH THE QUIEST (SIC) ENJOYMENT COVENANT CONTAINED IN § 41 OF THE LEASE.
 J. APPELLANT IS NOT LIABLE TO APPELLEES FOR DAMAGES EVEN IF IT FAILED TO FULFILL AN OBLIGATION TO REPAIR AS PROVIDED IN § 26(C)(2), (C)(3), ET SEQ[.], 59.
In its second assignment of error, appellant contends that the trial court erred in failing to award judgment to appellant because appellees failed to establish valid defenses to the lease obligations. In essence, appellant argues that the verdict was against the manifest weight of the evidence. We disagree.
In reviewing the trial court's judgment, it is well established that every reasonable presumption must be made in favor of the judgment and findings of fact. Seasons Coal v. Cleveland (1984), 10 Ohio St.3d 77. Furthermore, judgments supported by competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus.
Section 23(A) of the lease agreement, entitled "Repairs by Landlord", provides:
 Landlord shall keep the roof, structural portions and exterior of the Premises in good and tenantable condition and repair during the Term of the Lease, provided, however, that Landlord shall not be required to make repairs necessitated by reason of the neglect, fault or default of Tenant or its agents, employees, contractors or customers; and provided further and notwithstanding anything in this Lease to the contrary, Tenant, not Landlord, shall make all repairs, alterations and replacements to the property which Landlord is required to maintain which may be required as the result of repairs, alterations, other improvements or installations made by Tenant or any assignee, sub-tenant or concessionaire of Tenant or the agents of any of them.
Thus, pursuant to this section, appellant was responsible for keeping the roof of the Shaker Moreland Shopping Center in good repair during the lease term unless the repair was necessitated by any alterations or installations to the roof made by appellees.
Appellant argued at trial, and argues on appeal, that it had no duty to fix the leak into the space leased by appellees because Bubba's Q caused the leak when it installed ventilation ducts that penetrated through the parking deck of the shopping center. Appellant presented no evidence, however, that the leakage problem was caused by improper venting performed by Bubba's Q. Although Patricia Morgan testified regarding various repairs to the roof, she did not testify that the repairs were necessitated by installation of the ventilation ducts by Bubba's Q. Steven Eisenberg did not offer any testimony regarding the vents or repairs to the roof. Patricia Neubert testified that she observed water damage on the ceiling in the area where Bubba's Q had installed the ventilation ducts, but acknowledged that she did not know whether the water got into the ceiling through the penetrations in the roof caused by the ventilation units installed by Bubba's Q or from the penetrations made in the roof by the heating and cooling units installed by other tenants, the fence around the roof or the small house on the roof.
The evidence presented by appellees, however, overwhelmingly showed that the roof of the Shaker Moreland Shopping Center had a significant leakage problem that existed for years before Bubba's Q assumed its tenancy in June 1994 and that the leak in the ceiling of Bubba's Q was a result of appellant's failure to properly repair the roof, rather than a result of penetration of the roof by the ventilation ducts.
Gregory Simon testified that he was hired by appellant in 1992 to fix the roof of the parking deck of the Shaker Moreland Shopping Center because various tenants were experiencing leaks in their ceilings. Simon also testified that because the roof is layered, water seeps into the interior space of the roof through cuts in the roof and then migrates down through the layers, eventually leaking through the ceiling of the leased spaces below, many feet away from where it originally entered the roof. Simon also testified that he worked on the roof some thirty to forty times between 1992 and 1994 but the repairs he performed were just "band-aids" because the entire roof was "completely gone" and needed to be replaced.
Joseph Collata testified that Market on the Square had problems with water leaking through its ceiling every spring from 1992 until 1998. Collata testified that when he complained to appellant about the leaks, appellant would "patch" the roof.
William Gallagher testified that he examined the roof in July 1996 and determined that the leakage in the space formerly occupied by Bubba's Q was not coming from the penetrations in the roof made by the ventilation ducts and that the vents were adequately sealed where they penetrated the roof. He further testified that he observed small puddles "everywhere" on the roof and numerous small cracks in the asphalt.
Perhaps most significantly, James Baker testified that when the contractor he had hired to install the ventilation ducts cut through the drop ceiling (not the roof) of the leased space, he found a bucket, full of water that had leaked through the roof, in the ceiling. When the contractor made another hole in the ceiling, water "started gushing in" and continued to drain from the ceiling for three days, delaying installation of the ventilation ducts. It is apparent, therefore, that there was a significant amount of water leaking into Bubba's Q before the ventilation ducts were installed.
On the evidence presented at trial, the trial court reasonably concluded that the roof leaked extensively prior to the tenancies of both Bubba's Q and Dattilo and, thus, that appellant did not meet its burden of demonstrating that the leak was caused by appellees, thereby relieving it of its duty pursuant to Section 23(Q) of the lease agreement to fix the roof and eliminate the leak.
On the evidence presented at trial, the trial court also reasonably found that appellant breached the covenant of quiet enjoyment, set forth in Section 41 of the lease agreement:
 Landlord hereby covenants and agrees that if Tenant shall perform all of the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall at all times during the continuance hereof have the peaceable and quiet enjoyment and possession of the Premises without any hindrance from Landlord or any person or persons lawfully claiming the Premises, save and except in the event of the taking of said Premises by public or quasi-public authority as hereinbefore provided.
In Ohio, a covenant of quiet enjoyment is implied into every lease contract for realty and protects the tenant's right to a peaceful and undisturbed enjoyment of its leasehold. Dworkin v. Paley (1994), 93 Ohio App.3d 383, 386. Appellant contends that a covenant of quiet enjoyment means only that the landlord will not permit anyone with a paramount title to interfere with the tenant's possession of the leasehold during the lease term. Contrary to appellant's assertion, however, neither this court nor the Ohio Supreme Court has limited the covenant of quiet enjoyment in this way. Rather, the covenant is breached when the landlord "obstructs, interferes with, or takes away from the tenant in a substantial degree the beneficial use of the leasehold". Id., quoting Howard v. Simon (1984), 18 Ohio App.3d 14, 16, citing Frankel v. Steman (1915), 92 Ohio St. 197, 200. The degree of the impairment is a question for the finder of fact, Id., although to constitute a breach of the covenant, "the interference with the tenant's quiet enjoyment must be so substantial as to be tantamount to an eviction, actual or constructive." Endress v. Equitable Life Assurance(Oct. 29, 1987), Cuyahoga App. No. 52958, unreported. A constructive eviction occurs when "the acts of interference by the landlord compel the tenant to leave, and * * * he is thus in effect dispossessed, though not forcibly deprived of possession." Sciascia v. Riverpark Apts. (1981), 3 Ohio App.3d 164, 166, citing Liberal Savings Loan Co. v. Frankel Realty Co. (1940), 137 Ohio St. 489,499.
Here, there is no question that appellant's failure to fix the roof interfered so substantially with Dattilo's possession of the premises that he was forced to leave. Dattilo testified that in January 1996, when he met Steven Eisenberg at the space formerly occupied by Bubba's Q, "the whole place looked like it was raining inside." Eisenberg testified that when he took Dattilo through the space, there was standing water on the floor, the ceiling was "noticeably leaking" and it would have been impossible for Dattilo to open a restaurant under those conditions. The videotape taken by Dattilo in September 1996 after he vacated the space showed that the leak was still not fixed. There was standing water on the floor of the space and water dripping through the ceiling around the ventilation ducts. On this evidence, it is apparent that appellant's refusal to fix the roof made it impossible for Dattilo to operate a restaurant on the premises and so interfered with his use of the premises that he was constructively evicted. Therefore, the trial court properly found that appellant breached the covenant of quiet enjoyment.
Appellant contends, however, that Dattilo cannot assert appellant's breach of the covenant of quiet enjoyment as a defense to its complaint because Bubba's Q assigned its lease to Dattilo and, therefore, Bubba's Q, rather than appellant, conveyed possession of the premises to Dattilo. We disagree.
"Where possession of real estate is given to a lessee under the provisions of a lease, * * *, the lessee holds for the lessor; the possession of the former is the possession of the latter * * *. Consequently, the estate of a lessor in a lease for years is not one in expectancy, but in possession. The tenant is not seised or possessed of the land, but only of a term of years; the seisin of the freehold remains in the lessor." 65 Ohio Jurisprudence 3d 101-102, (1996) Landlord and Tenant, Section 79. Accordingly, appellant retained possession of the premises during both Bubba's Q and Dattilo's tenancies and therefore, Dattilo could properly assert appellant's breach of the covenant of quiet enjoyment as a defense to appellant's claims.
Appellant also argues that the covenants in the lease are independent of each other and, therefore, even if appellant breached its contractual obligation to repair the roof or the covenant of quiet enjoyment, appellees were still obligated to pay rent. The Ohio Supreme Court has stated, "Covenants in leases * * * are generally independent, in the absence of clear indications to the contrary, and the lessee is relieved from performance of his covenants only by actual or constructive eviction." (Emphasis added.) Liberal Savings Loan Co. v. Frankel Realty Co. (1940),137 Ohio St. 489. Because Dattilo was constructively evicted by appellant, even if the clauses in the lease agreement are independent, neither he, nor the Bakers, were obligated to pay rent. See also, Huber Investment Corp. V. Warner (Jan. 30, 1998), Montgomery Cty. No. 16545, unreported ("The landlord, electing not to continue to provide the quiet enjoyment of the freehold to the tenant, ought not to expect the tenant to continue the pay the rent due as consideration for that quiet enjoyment.")
We find appellant's arguments regarding other clauses in the lease agreement similarly unpersuasive. If the clauses in the lease are truly independent, as appellant asserts, then the fact that appellees accepted the premises "as is," pursuant to Section 6(A) of the lease agreement, does not relieve appellant of its obligation, as set forth in Section 23(A) of the lease agreement, to "keep the roof * * * in good and tenantable condition and repair during the term of the Lease." Moreover, although we agree with appellant's contention that there is not an implied warranty of habitability in a commercial lease, Parco Scientific Co. v. Raptis (Feb. 7, 1986), Trumbull App. No. 3447, unreported, the trial court did not find that appellant had breached a warranty of habitability. Although it stated that the property "was not habitable," it specifically found that appellant breached the covenant of quiet enjoyment. Thus, whether or not there was a warranty of habitability in the lease agreement is a moot point. Similarly, having found appellant to have breached the lease agreement, whether the parties were or were not of equal bargaining power or whether the lease was unambiguous and drafted by both parties are moot points.
Likewise, appellant's argument that it cannot be liable for any breach of its duty to repair because appellees waived any claims for damages resulting from appellant's failure to keep the building or leased premises in repair in Sections 26(B) and 26(C) of the lease agreement is simply not relevant to this action. Appellees are not contending that they have a liability damage claim against appellant for their loss of property. Rather, they contend — and we agree — that appellant's breach of its duty to keep the roof in good repair and the covenant of quiet enjoyment relieved appellees of their obligations pursuant to the lease agreement.
Finally, appellant's argument that the trial court improperly considered Gregory Simon to be an expert in roofing design and construction, even though appellees did not present an expert report or qualify Mr. Simon as an expert before he testified, is not supported by the record.
When making his findings of fact and conclusions of law, the trial judge stated:
 Mr. Simon, who worked for GMS from 1992, perhaps into `95 and `96, a man who had worked on this parking deck some thirty or forty times. Mr. Simon told us that, in his words, that the roof was gone. The roof was shot. He recommended replacement, but the only thing he saw happening was bandages. Those are all his words.
 This man Simon is a person with twenty years experience in design and construction of roofs. He told these problems, he says and I believe him, to Mr. Van Demere and to Mr. Graines, the GMS people * * *.
The fact that the trial judge referred to Simon's many years of experience in the roofing industry — which Simon testified to — does not mean that the trial judge improperly considered him to be an expert in the field. Rather, our interpretation of the trial judge's statement is that he considered Simon knowledgeable about the roof at the Shaker Moreland Shopping Center because he had worked on it many times.
Appellant's second assignment of error is overruled.
Appellant's third assignment of error states:
 III. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING APPELLANT'S MOTION FOR SUMMARY JUDGMENT AND BY FAILING TO FIND WHICH MATERIAL FACTS ARE ACTUALLY AND IN GOOD FAITH CONTROVERTED.
In its third assignment of error, appellant contends that the trial court erred in denying its motion for summary judgment. Appellant contends that the trial court also erred by not issuing a written opinion stating which facts were in dispute.
In Continental Ins. Co. v. Whittington (1994), 71 Ohio St.3d 150, syllabus, the Supreme Court of Ohio held:
 Any error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made.
The Supreme Court noted, however, that a denial of a motion for summary judgment is not rendered harmless, even after a trial, where the motion raises "pure questions of law".
Our review of appellant's motion for summary judgment indicates that it raised numerous disputed questions of material fact, not "pure questions of law". Accordingly, even if the trial court erred in denying appellant's motion (which it did not), any error was made moot by the trial judge's determination after a bench trial on the merits finding in favor of appellees.
Appellant also argues that the trial court was required to make findings of fact and conclusions of law in support of its decision denying appellant's motion. That is not the law in Ohio. Nowhere in Civ.R. 56, which sets forth the requirements for granting a motion for summary judgment, are separate findings of fact and conclusions of law required. Moreover, Civ.R. 52, which provides that a party may, within seven days after receipt of notice of a decision tried by a court without a jury, make a written request that the court state its findings of fact separately from its conclusions of law, specifically states: "Findings of fact and conclusions of law required by this rule * * * are unnecessary upon all other motions including those pursuant to * * * Rule 56." (Emphasis added.)
Appellant's third assignment of error is overruled.
Appellant's fourth assignment of error states:
 IV. THE TRIAL COURT ERRED IN NOT SUSTAINING APPELLEE'S WAIVER OF JURY TRIAL.
In its fourth assignment of error, appellant argues that the trial court erred in denying its motion to strike appellees' jury demand. Assuming, without deciding, that the trial court erred, appellant was not prejudiced by the trial court's decision. Prior to commencing trial, appellees waived their jury demand and the case proceeded to a bench trial. Thus, appellant received the bench trial to which it claims it was entitled.
Appellant's fourth assignment of error is overruled.
Appellant's fifth assignment of error states:
 V. ATTORNEYS['] FEES AT TRIAL AND ON THIS APPEAL ARE AWARDABLE TO PLAINTIFF-APPELLANT.
In its fifth assignment of error, appellant contends that it is entitled to an award of attorneys' fees because Section 38(K) of the lease agreement provide appellant with a contractual right to recover attorneys' fees and the costs of litigation. This argument is without merit.
Section 38(K) of the lease agreement provides, in pertinent part:
 Should the Landlord be made a party to any litigation commenced by or against the Tenant (whether said litigation is commenced during the Term of this Lease, or any Extensions of the Term, or after the termination thereof), without fault on the part of the Landlord, the Tenant shall pay all costs and expenses including attorney's fees incurred by or against the Landlord in connection with the litigation; and the Tenant shall also pay all court costs, court reporting costs, and stenographic fees, and attorney's fees incurred by or against Landlord in enforcing the terms, provisions, and covenants of this Lease * * *.
Ohio courts adhere to the "American Rule," which prohibits the prevailing party's recovery of attorney fees as part of the costs of civil litigation except where 1) there is statutory authorization (e.g. R.C. 163.21, 309.13, 733.61 and 1313.51); 2) the unsuccessful party acts "in bad faith, vexatiously, wantonly, obdurately, or for oppressive reasons," Sorin v. Warrensville Hts. School Dist. Bd. Of Edn. (1976), 46 Ohio St.2d 177, 181; or 3) there is an enforceable contract providing therefor. Nottingdale Homeowners' Assn. v. Darby (1987), 33 Ohio St.3d 32; GMS Management Co., Inc. v. Seminaro (July 22, 1993), Cuyahoga App. No. 63007.
Here, appellant is not the prevailing party and, therefore, is not entitled to either attorneys' fees or costs.
Appellant's fifth assignment of error is overruled.
III. Cross-Appellant Dattilo's Assignment of Error
Dattilo's cross-assignment of error states:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLEE/CROSS-APPELLANT ALBERT DATTILO WHEN IT FAILED TO AWARD HIM JUDGMENT ON HIS COUNTERCLAIM.
In his cross-assignment of error, Dattilo contends that the trial court erred in failing to award him judgment on his counterclaim for lost profits. Dattilo contends that his claim for lost profits was not too speculative, even though it involved a new business, and, therefore, the trial court should have awarded him judgment regarding his counterclaim.
The general test in the state of Ohio for the recovery of lost profits is set forth in Charles R. Combs Trucking, Inc. v. Internatl. Harvester Co. (1984), 12 Ohio St.3d 241, at paragraph two of the syllabus:
 Lost profits may be recovered by the plaintiff in a breach of contract action if: 1) profits were within the contemplation of the parties at the time the contract was made, 2) the loss of profits is the probable result of the breach of contract, and 3) the profits are not remote and speculative and may be shown with reasonable certainty.
In AGF v. Great Lakes Heat Treating Co. (1990), 51 Ohio St.3d 177,183, the Ohio Supreme Court recognized that a new business may recover lost profits in a breach of contract action but such lost profits must be established with reasonable certainty. A new business may establish lost profits with reasonable certainty "through the use of such evidence as expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and any other relevant facts". Id. at 183-184.
Here, Dattilo did not demonstrate his lost profits with the required "reasonable certainty". The only evidence regarding lost profits was Dattilo's testimony, in which he estimated lost profits of $250,000 to $275,000 per year. This estimate was based on Dattilo's observations of the traffic at Market on the Square, a discussion with Baker regarding the volume of business done by Bubba's Q and Dattilo's knowledge of the volume of business done by his other restaurant. Dattilo did not submit any business records from either his or Baker's business, however, to substantiate his estimates, nor did he submit any documentation to support his observation of the traffic at Market on the Square. Furthermore, Dattilo did not offer any expert testimony to substantiate his claim.
While a new business may recover lost profits as damages for breach of contract, such damages must be demonstrated with reasonable certainty. On the evidence presented, the trial court could reasonably find that Dattilo did not demonstrate lost profits with reasonable certainty. Accordingly, the trial court did not err in finding in favor of appellant regarding Dattilo's counterclaim for lost profits.
Dattilo's cross-assignment of error is overruled.
It is ordered that appellees recover of appellant their costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 ___________________________ TIMOTHY E. McMONAGLE, JUDGE
DIANE KARPINSKI, P.J. and JAMES D. SWEENEY, J., CONCUR.
[1] Although defendants-appellees James and Sabrina Baker filed a notice of cross-appeal, they asserted no cross assignments of error in their brief on appeal.
[2] Subsequently, on cross-examination, Graines gave very evasive answers regarding who is the owner, president or CEO of GMS. Finally, after questioning Graines in chambers regarding his status at GMS, the judge reported that Mr. Graines said there is nobody over him [at GMS] * * *. Our interpretation of Graines' unnecessarily evasive testimony is that he is the owner of GMS Management.
[3] Appellant's second assignment of error includes numerous subparts, three of which raise issues unrelated to appellant's second assignment of error. Accordingly, we will consider these issues as additional assignments of error.