BOBB FOREST PRODUCTS, INC., Appellee,

v.

MORBARK INDUSTRIES, INC., Appellant, et al.

[Cite as *Bobb Forest Products, Inc. v. Morbark Industries, Inc.*, 151 Ohio App.3d 63, 2002-Ohio-5370.]

Court of Appeals of Ohio,
Seventh District, Belmont County.

Nos. 01 BA 25 and 02 BA 3.

Decided Sept. 30, 2002.

68

Gallagher, Bradigan, Gams, Pryor & Littrell, James R. Gallagher and Kevin R. Nose, for appellee.

Warner, Norcross & Judd, L.L.P., and Kevin G. Dougherty; Banker & White and Harry W. White, for appellant.

DeGenaro, Judge.

{¶ 1} This timely appeal comes for consideration upon the record in the trial court, the parties' briefs, and their oral argument before this court. Defendant-appellant, Morbark, Inc., appeals from the judgment of the Belmont County Court of Common Pleas which entered a verdict in favor of plaintiff-appellee, Bobb Forest Products, Inc. ("BFP") in the amount of $1 million against Morbark and co-defendant, John McCormick, who is not a party to this appeal. We are asked to decide (1) whether BFP should be allowed to recover on express and implied warranty theories, (2) whether the trial court should have granted a new trial because the jury's damages award is against the manifest weight of the evidence, and (3) whether the trial court properly granted BFP's motion for a nunc pro tunc entry reflecting judgment against Morbark, Inc. rather than Morbark Industries, Inc. We conclude that the trial court properly granted BFP's motion for the nunc pro tunc entry, properly denied Morbark's motion for a new trial as the jury's verdict was supported by competent, credible evidence, and properly denied Morbark's motions seeking to prevent BFP from recovering under theories of express and implied warranties. Thus, we affirm the trial court's judgment.

{¶ 2} Shon Bobb was sole shareholder and president of BFP, a corporation established to run a sawmill located in Belmont County, Ohio. When Bobb was initially starting up BFP's operations, he tried to obtain a Clearman brand sawmill for BFP's use. However, he would have had to wait six months to obtain a Clearman saw. He did not want to wait that long at the time as he would not be able to make the most out of BFP's current opportunities in the market.

{¶ 3} McCormick heard that Bobb was looking to buy a sawmill and, as an authorized dealer of Morbark brand sawmills, approached Bobb in an effort to sell him a Morbark sawmill. Bobb had reservations about purchasing a Morbark sawmill as they had a reputation in the industry as a bad sawmill. However, McCormick assured Bobb that Morbark built a great sawmill. Bobb also informed McCormick of the specific level of production he sought to get from the

mill. McCormick assured him that the mill would meet his needs. McCormick also provided Bobb with Morbark's sales brochures. Those brochures promised that the mill was designed for "sawing grade, dimensional lumber and cants," that it was capable of "producing from two to ten million board feet per year," and that the mill would be "[f]actory built to exact tolerances for high production and accurately cut lumber." Bobb was also provided with three videotapes extolling the virtues of the Morbark sawmill.

{¶ 4} Bobb then talked to Vern Sandborn, the sales representative for Morbark's sawmill division. Sandborn assured Bobb that Morbark sawmills were running great, there were no maintenance problems, and they were a very good machine. Sandborn indicated that the machine would work very well for what Bobb needed. Based on the sales brochures, the videotapes, and the assurances from both McCormick and Sandborn, Bobb decided to purchase a Morbark sawmill on behalf of BFP. He arranged for McCormick to install the sawmill as a turnkey operation. When the mill was turned over to him all the components would be installed, and he could begin sawing wood. The purchase price of this turnkey operation was $302,550. After agreeing to purchase the Morbark sawmill, Bobb proceeded to do other things related to the startup of the business, such as hiring employees, buying extra equipment, and obtaining a supply of logs.

{¶ 5} When the mill was shipped to McCormick for installation, Morbark sent a warranty document with the shipment. The warranty contained specific disclaimer language that negated any express warranties made by Morbark and limited BFP's damages solely to repair or replacement of the sawmill. Furthermore, it limited its liability to six months after the installation date. After Morbark shipped the sawmill to McCormick, he installed it at BFP's site. BFP never received a copy of that warranty and Bobb testified that he did not see a copy of the document until a week before trial.

{¶ 6} The mill was supposed to be ready December 25, 1995. However, due to delays in delivery from Morbark and cold weather on site, McCormick did not complete the installation until around March 15, 1996. When Bobb saw the sawmill and the related equipment he was surprised to discover that some of the equipment was not Morbark equipment. McCormick had contracted for local suppliers to manufacture some of the equipment according to McCormick's designs. The invoice McCormick gave to Bobb reflected that fact. McCormick told Bobb that Morbark had agreed to the arrangement and if the locally produced equipment did not work, it would be replaced. Sandborn testified that the locally made equipment was neither inadequate nor improper for the purposes it was meant to serve.

{¶ 7} Bobb first began to run the sawmill on April 1, 1996. He immediately began experiencing problems with the saw. For instance, his employees had to

continually tighten the bolts on the mill and the mill continually failed to cut lumber properly. Those problems resulted from both Morbark parts and the components McCormick had manufactured locally. McCormick came out to BFP's jobsite numerous times over the next couple of months in order to fix those problems.

{¶ 8} In June 1996, McCormick was in South America with Sandborn overseeing the installation of a Morbark piece of equipment. Bobb continued to have problems with the mill. Because he could not contact McCormick about the problems, he called Morbark's main office in Winn, Michigan. The next day, Morbark had Rod Roosa, the man who actually built the sawmill for Morbark, come down to fix the problems. Roosa saw that the mill was cutting thick and thin lumber and did not notice any maintenance problems. He found various problems with the sawmill: the tracks were not installed level; the bolts holding the sawmill together were not tight (Bobb testified that BFP employees had to tighten the bolts before almost every shift); the factory had incorrectly machined the wheels, which caused the tracks they ran on to wear prematurely; and the cooler on the hydraulics system was not working, causing the hydraulic oil to be running too hot. Roosa fixed those problems and installed a new setworks on the sawmill in an effort to fix the inconsistent width of the cut lumber. He testified that the sawmill cut straight lumber after he was done with it. He also testified that, based on his experience, many of the problems were Morbark's fault.

{¶ 9} Roosa stayed on site for a couple of weeks until McCormick and Sandborn arrived. The two knew of the problems with the sawmill and knew that Roosa was on site working on the sawmill. Therefore, they came straight to BFP upon arrival from South America. After Sandborn and McCormick arrived, Roosa returned to Morbark's plant in Michigan, as he felt those two were more qualified to repair the machine. Sandborn and McCormick used Locktite to secure the bolts on the sawmill into place. Sandborn also found that the wheels were machined incorrectly and had new wheels made and installed. Finally, he thought that Roosa made a mistake when he raised one track in an attempt to level the tracks, as he thought this made the track unlevel. Sandborn lowered the track to its original position. When he was done, Sandborn thought the problems had been fixed, so he returned to Michigan.

{¶ 10} After Morbark's employees had tried to fix the problems with the sawmill, the problems persisted. For instance, the bolts kept coming loose and it would take up to two hours each day to tighten them down. Bobb borrowed over $100,000 from his parents in an effort to make the sawmill productive. However, the mill kept cutting the lumber improperly and Bobb began to get complaints from his customers. Due to the problems with the lumber BFP was producing,

in December 1996 Bobb's lumber broker told him he could no longer sell BFP lumber.

{¶ 11} That same month, Bobb and his parents had a meeting with McCormick in McCormick's office and they, as a group, called Morbark again. Morbark sent Sandborn down to try to fix the problems. This time, Sandborn discovered that, among other problems, Morbark had put the wrong bolts on the sawmill. The bolts used were too small and only one thread of the bolt was catching on the mill, which led to the continual need to tighten the screws. Sandborn acknowledged that the loose bolts may have caused the sawmill to cut the lumber improperly. He further acknowledged that had the proper bolts been used and locktited down, they probably never would have come loose. In addition, the new wheels installed on the sawmill in June were machined incorrectly. Upon hearing that it might take Sandborn an additional two weeks to complete repairs, Bobb had him stop attempting the repairs. Bobb then shut down operations and closed the sawmill. In the nine months it was operational, the sawmill produced approximately 1.3 million board feet of wood including the amount of improperly cut lumber. Bobb testified that 80 percent of the problems were related to Morbark equipment and 20 percent of the problems were related to non-Morbark equipment.

{¶ 12} Soon thereafter, BFP filed a complaint against Morbark, McCormick, and Rod's Welding & Rebuild Shop, the company that manufactured the locally made equipment for the sawmill. That complaint alleged 11 counts against the defendants including breach of express and implied warranties, deceptive trade practices, fraud, strict liability, negligence, and other unlawful conduct.

{¶ 13} After discovery, Morbark moved for summary judgment and McCormick and Rod's Welding filed their motions to dismiss and for summary judgment. After all of the parties filed responsive memorandum, the trial court ruled on the respective motions. It dismissed all claims against Morbark except those based on the violation of express and implied warranties. The trial court also overruled the pending motion to dismiss and granted the motions of McCormick and Rod's Welding as to some of the claims against them.

{¶ 14} The matter proceeded to jury trial. At the close of the plaintiff's case-in-chief, each defendant moved for a directed verdict. The trial court denied the motions of Morbark and McCormick, but granted Rod's Welding's motion and dismissed that party from the case. Morbark and McCormick renewed their motions for a directed verdict at the close of all the evidence. Those motions were also denied. The jury returned a verdict for $1 million. The jury interrogatories indicated that $950,000 of the verdict was allocated to Morbark and $50,000 of the verdict was allocated to McCormick. However, the jury interrogatories were inconsistent with the jury's verdict against McCormick.

Rather than sending the jury back for further deliberations to resolve the inconsistency, BFP and McCormick agreed on the record to settle the claim for $25,000. Thereafter, the trial court entered judgment in accordance with the jury's verdict.

{¶ 15} Following the court's entry of judgment, Morbark timely filed a motion for judgment notwithstanding the verdict or, in the alternative, a motion for a new trial on damages. The trial court heard oral arguments on the motions and denied them. Morbark timely appealed from this judgment and that appeal was given appellate number 01 BA 25.

{¶ 16} Subsequently, BFP filed a motion for a Civ.R. 60(A) relief. In its original complaint, BFP did not name "Morbark, Inc." as a party-defendant. Instead, it named "Morbark Industries, Inc." and "Morbark Sawmill Supply, Inc." as the party-defendants. However, BFP later moved to amend its complaint in order to substitute "Morbark, Inc." as the proper party-defendant and the trial court granted that motion. However, the jury interrogatories and verdict forms named Morbark Industries, Inc., rather than Morbark, Inc., as the defendant. The judgment entry resulting from the jury verdict also granted judgment against Morbark Industries, Inc., rather than Morbark, Inc. In its motion for a nunc pro tunc entry, BFP asked the trial court to correct the record to reflect judgment against Morbark, Inc., rather than Morbark Industries, Inc.

{¶ 17} This court granted the trial court leave to consider the Civ.R. 60(A) motion. Morbark filed a memorandum opposing the motion and the matter was heard by the trial court, which granted the motion. Morbark timely appealed this judgment and that appeal was assigned appellate number 02 BA 03. Case numbers 01 BA 25 and 02 BA 03 have been consolidated on appeal.

{¶ 18} We affirm the trial court's judgment for three reasons. First, Civ.R. 60(A) relief may be granted only to change mistakes that are mechanical, rather than substantive, in nature. It is the type of mistake, not its ultimate effect on the parties, that determines whether that relief should be granted. In this case, the record clearly demonstrated that the trial court intended to render judgment against Morbark, Inc. rather than Morbark Industries, Inc. and, thus, that its mistake was a blunder in execution that is proper for Civ.R. 60(A) relief. Second, the trial court may only take issues from the province of the jury via summary judgment, directed verdict, or JNOV when, construing the evidence most strongly in favor of the nonmovant, the evidence leads to only one conclusion that is adverse to the nonmovant. In this case, the evidence could demonstrate the existence of express and implied warranties that Morbark made to BFP and, thus, the trial court properly submitted these issues to the jury and denied JNOV after the jury's verdict. Finally, a reviewing court is not free to disturb a jury's award of damages absent a finding of passion and prejudice or a

conclusion that the award is manifestly out of line. In this case, competent credible evidence supports the jury's award, and thus the trial court properly denied Morbark's motion for a new trial.

{¶ 19} Morbark's three assignments of error arising from the trial court's original judgment entry argue:

{¶ 20} "The trial court erred in failing to grant Morbark's motion for summary judgment and/or motion for directed verdict and/or motion for judgment notwithstanding the verdict on Plaintiff's express warranty claims."

{¶ 21} "The trial court erred in failing to grant Morbark's motion for summary judgment and/or motion for directed verdict and/or motion for judgment notwithstanding the verdict on Plaintiff's implied warranty claims."

{¶ 22} "The trial court erred in failing to grant Morbark's motion for a new trial on the issue of damages."

{¶ 23} Morbark's sole assignment of error relating to the trial court's decision to grant Civ.R. 60(A) relief to BFP argues:

{¶ 24} "The trial court abused its discretion and erred as a matter of law in granting plaintiff's nunc pro tunc motion to amend the judgment by substituting defendant Morbark, Inc. for Defendant Morbark Industries, Inc. under Rule 60(A)."

{¶ 25} Because portions of Morbark's assignments of error deal with the same issues of law and fact, those portions will be dealt with together. Furthermore, because our resolution of the propriety of the trial court's decision to grant Civ.R. 60(A) relief to BFP may render the remaining assignments of error moot, we will address the issues raised in that assignment of error first.

{¶ 26} In its final assignment of error, Morbark argues that the trial court erred when it entered a nunc pro tunc entry correcting the judgment entry to reflect the judgment was against Morbark, Inc., rather than Morbark Industries, Inc. Civ.R. 60(A) allows a trial court to correct "[c]lerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission." Civ.R. 60(A) does not authorize a trial court to make substantive changes. *State ex rel. Litty v. Leskovyansky* (1996), 77 Ohio St.3d 97, 100, 671 N.E.2d 236. "The function of nunc pro tunc is not to change, modify, or correct erroneous judgments but merely to have the record speak the truth." *Ickes v. CNA Ins., d.b.a. Transcontinental Ins. Co.,* 5th Dist. No. 2001CA00241, 2002-Ohio-2531, at ¶ 19, 2002 WL 975626; *Dentsply Internatl., Inc. v. Kostas* (1985), 26 Ohio App.3d 116, 26 OBR 327, 498 N.E.2d 1079. Accordingly, its proper use is limited to reflecting what the court actually decided, not what the

court might or should have decided or what the court intended to decide. *Leskovyansky* at 100, 671 N.E.2d 236.

{¶ 27}  With regard to our standard of review, it is within the trial court's discretion to correct mistakes pursuant to Civ.R. 60(A) and its decision will not be reversed absent an abuse of that discretion.  Id. An abuse of discretion connotes more than an error of law or judgment; it implies that the trial court acted unreasonably, arbitrarily, or unconscionably.  *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 28}  A clerical mistake contemplated by Civ.R. 60(A) is mechanical in nature, apparent on the record, and does not involve a legal decision or judgment by an attorney.  *Leskovyansky* at 100, 671 N.E.2d 236; *Dentsply* at paragraph two of the syllabus.  As the Twelfth District explained:

{¶ 29}  "The basic distinction between clerical mistakes that can be corrected under Civ.R. 60(A) and substantive mistakes that cannot be corrected is that the former consists of 'blunders in execution' whereas the latter consists of instances where the court changes its mind, either because it made a legal or factual mistake in making its original determination, or because, on second thought, it has decided to exercise its discretion in a different manner." *Kuehn v. Kuehn* (1988), 55 Ohio App.3d 245, 247, 564 N.E.2d 97, citing *Blanton v. Anzalone* (C.A.9, 1987), 813 F.2d 1574, 1577.

{¶ 30}  A proper modification of a judgment entry pursuant to Civ.R. 60(A) cannot be characterized as a substantial change merely because of its effect.  *Foster v. Foster* (Sept. 23, 1997), 4th Dist. No. 96CA1767, at 6, 1997 WL 583567.

{¶ 31}  "We can easily envision a simple scrivener's error in which, for example, an eight is transposed for a nine, resulting in an order that provides that payments are to increase effective 1895 instead of 1995.  Is the trial court prevented from correcting this error pursuant to Civ.R. 60(A) because such correction would result in one party's loss of one hundred years worth of payments?  We think not.  *It is the nature of the correction, rather than the effect of the correction which must be examined.*"  (Emphasis added.)  Id.

{¶ 32}  Thus, a judgment entry which disagrees with a trial court's on-the-record pronouncement may be changed by a nunc pro tunc entry.  Id. Similarly, a nunc pro tunc entry is proper when the nunc pro tunc entry demonstrates that it, and not the original entry, is what the trial court actually decided.  *Ellsworth v. Ellsworth* (Dec. 13, 1996), 11th Dist. No. 95–A–0073, 1996 WL 757521.  Likewise, a change of an item like a date or a number in a judgment entry is a mechanical change which may be accomplished via a nunc pro tunc

order if there is evidence on the record which supports the trial court's original decision. *Allen v. Allen* (Mar. 31, 2000), 11th Dist. No. 99–T–0011, 2000 WL 522159; *W.E. Quicksall & Assoc., Inc. v. Gibson* (July 8, 1996), 5th Dist. No. 95AP090061, 1996 WL 488877.

{¶ 33} However, when it appears from the record that the trial court made a deliberate, affirmative, but incorrect choice, then that choice may not be changed through a nunc pro tunc entry. See *McGowan v. Giles* (Mar. 16, 2000), 8th Dist. No. 76332, 2000 WL 284174; *Harlett v. Harlett* (Nov. 1, 1996), 2d Dist. No. 15799, 1996 WL 629510; *Michaels v. Aden* (Dec. 7, 1995), 8th Dist. No. 68561, 1995 WL 723303. Likewise, a trial court may not issue a nunc pro tunc order deciding an issue it did not previously decide. *Cureton v. Brenneman* (June 8, 2001), 6th Dist. No. L–00–1025, 2001 WL 640800; *Nemes v. Nemes* (Dec. 28, 1994), 9th Dist. No. 2331–M, 1994 WL 716232.

{¶ 34} In the instant case, the jury interrogatories and verdict forms the trial court submitted to the jury listed Morbark Industries, Inc. as the defendant. Likewise, its judgment entry grants judgment against Morbark Industries, Inc. This clearly is a clerical mistake. The record amply reflects that the ultimate reason for the trial was to determine whether *Morbark, Inc.* was liable to BFP for damages. Morbark's corporate secretary, Larry Noch, testified in an affidavit that Morbark Sawmill Supply, Inc. and Morbark Sales Corporation had merged into Morbark, Inc. That affidavit also represented that Morbark Industries, Inc. "did not manufacture, sell, service, or have anything to do with the sawmill at issue in this case." Morbark's warranty, admitted as Plaintiff's Exhibit 35 and Defendant's Exhibit E, was issued by Morbark Sales Corporation and states that the sawmill was manufactured by Morbark Sawmill Supply, Inc. Both companies are Morbark, Inc.'s predecessors in interest. Morbark's invoice, admitted as Defendant's Exhibit B, and its equipment order, admitted as Defendant's Exhibit C, show that Morbark Sales Corporation was the company that actually sold the sawmill. The user manuals admitted as Defendant's Exhibits G, H, I, and J all were issued by Morbark Sawmill Supply, Inc. Finally, in its nunc pro tunc entry, the trial court admitted that when it named Morbark Industries, Inc. in the jury interrogatories, the jury verdict forms, and the judgment entry, its actions were " 'in error' due to a 'blunder in execution.' "

{¶ 35} Morbark argues that BFP's opposition to Morbark Industries, Inc.'s motion for summary judgment indicates BFP's belief that Morbark Industries, Inc. is the defendant the jury properly found liable for BFP's damages. This argument is disingenuous. Morbark, Inc. was not added as a party-defendant until after BFP filed its memorandum in opposition to Morbark Industries, Inc.'s motion for summary judgment. Likewise, the record reflects that both Morbark Industries, Inc. and Morbark, Inc. are represented by the same counsel, that

during both opening statements and closing arguments all counsel referred to the defendants simply as "Morbark," and that Morbark Industries, Inc. never moved for summary judgment. These facts all demonstrate Morbark's sophistry in attempting to shield itself from any sort of liability in this case and further support the trial court's judgment to grant the nunc pro tunc entry.

{¶ 36} As can be seen, the record clearly reflects that the trial court never intended to submit the issue of whether Morbark Industries, Inc. was liable to BFP to the jury. Instead, the issue it intended to place before the jury was the issue the parties wanted placed before the jury: whether Morbark, Inc. was liable to BFP. The trial court subsequently realized its mistake. The trial court's mistake did not relate to the substantive issues before it. Rather, it was the type of "blunder in execution" that Civ.R. 60(A) is meant to correct. Accordingly, this assignment of error is meritless.

{¶ 37} In its first and second assignments of error, Morbark challenges the trial court's judgment to deny summary judgment, directed verdict, and JNOV on BFP's express and implied warranty claims against Morbark. We will first address the trial court's denial of summary judgments on those two claims together. We will then address the remainder of Morbark's arguments in relation to BFP's express warranty claims together before addressing the remainder of Morbark's arguments in relation to BFP's implied warranty claims.

{¶ 38} In both its first and second assignments of error, Morbark makes a similar argument: the trial court erred in not granting its motion for summary judgment on BFP's express and implied warranty claims against Morbark. "The standards for reviewing the denial of a summary judgment motion are substantially different than those governing the review of a decision which sustains a motion for summary judgment." *Lake Tomahawk Prop. Owners Assn., Inc. v. Smith* (Dec. 28, 2001), 7th Dist. No. 00 CO 37, at 2, 2001 WL 1700431.

{¶ 39} "Any error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made." *Continental Ins. Co. v. Whittington* (1994), 71 Ohio St.3d 150, 642 N.E.2d 615, syllabus.

{¶ 40} However, when the denial of a motion for summary judgment is based on a pure question of law and that question of law has an impact on the outcome of the case, then the denial of summary judgment may be reviewed by an appellate court. *Lake Tomahawk* at 2, citing *Wein v. Seaman Corp.* (1996), 116 Ohio App.3d 189, 194, 687 N.E.2d 477; *First Capital Corp. v. G & J Indus., Inc.* (1999), 131 Ohio App.3d 106, 111, 721 N.E.2d 1084.

{¶ 41}   Morbark argues that the trial court erred in denying summary judgment on the issues related to express and implied warranties because BFP abandoned the theories it used in opposition to the motion for summary judgment at trial.   However, the trial court instructed the jury on all of BFP's theories, including those BFP relied upon in opposition to Morbark's motion for summary judgment.   Furthermore, jury interrogatories six and seven specifically addressed those issues.   When it returned its verdict, the jury left interrogatories six and seven blank because it found that its verdict was unaffected by those issues and, thus, the trial court's decision to deny summary judgment did not impact the outcome of the case, i.e., there were other genuine issues of material fact supporting the judgment in favor of BFP. Accordingly, even if these issues were pure questions of law, the denial of summary judgment on the issues may not be reviewed by this court and any error by the trial court is harmless.   Thus, Morbark's arguments relating to the denial of summary judgment are meritless.

{¶ 42}   The remainder of Morbark's arguments address the trial court's denial of its motions for a directed verdict and/or JNOV on BFP's express and implied warranty claims.   "The standard for granting a motion for judgment notwithstanding the verdict or in the alternative for a new trial pursuant to Civ.R. 50(B) is the same as that for granting a motion for a directed verdict pursuant to Civ.R. 50(A)."   *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.* (1998), 81 Ohio St.3d 677, 678, 693 N.E.2d 271.   That standard is as follows:

{¶ 43}   "When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."   Civ.R. 50(A)(4).

{¶ 44}   The Ohio Supreme Court has further refined this standard:

{¶ 45}   "In addition to Civ.R. 50(A), it is well established that the court must neither consider the weight of the evidence nor the credibility of the witnesses in disposing of a directed verdict motion.   * * * Thus, 'if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied.   * * *' " *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284–285, 21 O.O.3d 177, 423 N.E.2d 467, quoting *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 115, 4 O.O.3d 243, 363 N.E.2d 367.

{¶ 46}   " 'The "reasonable minds" test of Civ.R. 50(A)(4) calls upon the court only to determine whether there exists any evidence of substantial probative value in support of [the claims of the party against whom the motion is

directed].'" *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 119, 671 N.E.2d 252, quoting *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 68–69, 23 O.O.3d 115, 430 N.E.2d 935. This is a question of law because it examines the materiality of the evidence rather than drawing conclusions from the evidence. Id. at 119–120, 671 N.E.2d 252.

{¶ 47} Morbark contends that the trial court should have granted a directed verdict or JNOV because its statements and conduct did not amount to an express warranty, but instead were mere puffing. Under R.C. 1302.26(A), (1) any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise, (2) any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description, or (3) any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

{¶ 48} "It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." R.C. 1302.26(B).

{¶ 49} "The 'basis of the bargain' test [in R.C. 1302.26(A) ] centers on the description or affirmation which goes to the heart of the basic assumption between the parties." *Barksdale v. Van's Auto Sales, Inc.* (1989), 62 Ohio App.3d 724, 728, 577 N.E.2d 426. For instance, a seller's awareness of the customer's needs and affirmation that the product will meet those needs are sufficient to create an express warranty. *Boyas Excavating, Inc. v. Powerscreen of Ohio, Inc.* (2000), 139 Ohio App.3d 201, 743 N.E.2d 464; see, also, *Brinegar v. Krabach* (June 21, 1996), 2d Dist. No. 95 CA 30, 1996 WL 339942 (statement of fact as to the abilities of the product may create express warranty). Likewise, representation of fact, such as a statement that a car has recently been overhauled and was in good shape or that nothing is wrong with the transmission, may create an express warranty. *Barksdale v. Van's Auto Sales, Inc.* (1989), 62 Ohio App.3d 724, 577 N.E.2d 426; *Novak v. Main Street Motors* (July 16, 1999), 11th Dist. No. 98–T–0148, 1999 WL 529530.

{¶ 50} Conversely, "puffing" or merely stating the seller's opinion does not amount to an express warranty. *Leal v. Holtvogt* (1998), 123 Ohio App.3d 51, 66, 702 N.E.2d 1246; R.C. 1302.26(B). For example, statements that a car "performed fine," was "good on gas," or was a "good choice" are "mere sales talk"

82

and, therefore, are merely puffing. *Novak* at 2; see, also, *Batesole v. Smith, d.b.a. R & R Serv. Ctr.* (Aug. 4, 1995), 6th Dist. No. S–94–020, 1995 WL 458782 (statement that car is "good, dependable" car is not basis for express warranty); *Chic Promotion, Inc. v. Middletown Sec. Sys., Inc.* (1996), 116 Ohio App.3d 363, 688 N.E.2d 278 (a sales brochure that advertises its product is "six times better than average" because of its "optimal" system selected from an "unprecedented variety" of components is merely puffing).

{¶ 51}  However, there need not be privity of contract for the ultimate consumer to recover due to an express warranty. *Rogers v. Toni Home Permanent Co.* (1958), 167 Ohio St. 244, 4 O.O.2d 291, 147 N.E.2d 612, paragraph three of the syllabus.  Indeed, the statement need not be made by the seller and still may be an express warranty if it was part of the basis of the bargain. *Slyman v. Pickwick Farms* (1984), 15 Ohio App.3d 25, 28–29, 15 OBR 47, 472 N.E.2d 380.

{¶ 52}  In the present case, Bobb testified that he saw Morbark's product guide, three sales videos about Morbark equipment that McCormick and Sandborn gave him, and he talked with Sandborn before he purchased the sawmill.  The product guide states that the mill is designed for sawing grade, dimensional lumber and cants, that it could produce between two and ten million board feet per year, that it was easy to operate, and was built to exact tolerances for high production and accurately cut lumber.  The videos made the same representations the product guide did about the sawmill.  Finally, Sandborn told Bobb that the other Morbark sawmills "were running great, every one of them they had out there was running really good, and there was no maintenance problems, and they were a good machine.  They would work very well for what [Bobb] need[s]."  Bobb testified that he decided to purchase the Morbark sawmill as a result of the representations made by McCormick and Sandborn and the representations in the Morbark product guide and on the videos.

{¶ 53}  Of course, some of the representations by Sandborn and the Morbark material are purely sales talk and puffing.  For instance, Sandborn's statement that the machines were "running real good" and that they were "a good machine" are expressions of Sandborn's opinion about those sawmills rather than statements of fact.  See *Novak*; *Chic Promotion*.  However, the product guide did promise that the sawmill would accurately cut grade, dimensional lumber, and cants.  This is a statement of fact as to the abilities of the sawmill like that in *Brinegar*.  Furthermore, Bobb testified that Sandborn stated that the sawmill would run well for what Bobb needed.  It appears that Morbark knew of Bobb's needs and averred that the sawmill would meet those needs.  See *Boyas Excavating*.  When viewing the testimony in the light most strongly in favor of

BFP, these statements were statements of fact that became a part of the underlying bargain. Thus, they created an express warranty and Morbark's argument to the contrary is meritless.

{¶ 54} Because each of Morbark's arguments in relation to BFP's express warranty claims is meritless, Morbark's first assignment of error is meritless.

{¶ 55} In its remaining arguments within its second assignment of error, Morbark asserts that the trial court erred in failing to grant its motions for a directed verdict and for JNOV for BFP's implied warranty claims against Morbark. In this case, the jury answered two jury interrogatories wherein it specifically found that Morbark breached two implied warranties: (1) the implied warranty that the sawmill was fit for a particular purpose and (2) the implied warranty that the sawmill was merchantable. Morbark argues that this issue should never have been before the jury, as there must be privity of contract in order to recover on a theory of implied warranty and in this case there was no privity of contract.

{¶ 56} There are two theories under which a plaintiff may recover against a defendant arising out of the defendant's implied warranties: (1) a tort theory of implied warranty and (2) a contractual theory of implied warranty. The contract-based theory arises out of the UCC and, because it is related to the UCC, to recover under this theory of liability there must be privity of contract between the plaintiff and the defendant. See *U.S. Fid. & Guar. Co. v. Truck & Concrete Equip. Co.* (1970), 21 Ohio St.2d 244, 50 O.O.2d 480, 257 N.E.2d 380. In contrast, the tort-based theory of implied warranty is indistinguishable from strict liability in tort and a plaintiff may be able to recover against a defendant pursuant to this theory despite the lack of privity of contract. *Iacono v. Anderson Concrete Corp.* (1975), 42 Ohio St.2d 88, 71 O.O.2d 66, 326 N.E.2d 267; *LaPuma v. Collinwood Concrete* (1996), 75 Ohio St.3d 64, 661 N.E.2d 714; *Ohio Dept. of Adm. Serv. v. Robert P. Madison Internatl., Inc.* (2000), 138 Ohio App.3d 388, 395, 741 N.E.2d 551. As BFP has never argued that the tort-based theory of implied warranty applies in this case, we are limited to determine whether it may recover under the contractual theory of implied warranty.

{¶ 57} To recover under a theory of implied warranty in contract, the plaintiff must show that it was in privity of contract with the defendant. *U.S. Fidelity*. In this case, there never was a contract signed between BFP and Morbark. However, when the manufacturer is so involved in the sales transaction that the distributor merely becomes the agent of the manufacturer, then the manufacturer and the ultimate consumer are in privity of contract. See *Mettler-Toledo, Inc. v. Wysong & Miles Co.* (Nov. 9, 1999), 10th Dist. No. 98AP–1462,

1999 WL 1009721; see, also, *Myers v. Moore Distrib., Inc.* (Feb. 1, 1993), 12th Dist. No. CA92–07–125, 1993 WL 19093.

{¶ 58} A consumer may also have privity of contract with the manufacturer if that consumer is an intended third-party beneficiary to a contract. *Am. Rock Mechanics, Inc. v. Thermex Energy Corp.* (1992), 80 Ohio App.3d 53, 608 N.E.2d 830. "A third-party beneficiary is one for whose benefit a promise is made, but who is not a party to the contract encompassing the promise." *Berge v. Columbus Community Cable Access* (1999), 136 Ohio App.3d 281, 303, 736 N.E.2d 517. In *Hill v. Sonitrol of Southwestern Ohio* (1988), 36 Ohio St.3d 36, 40, 521 N.E.2d 780, the Ohio Supreme Court adopted an "intent to benefit" test to determine whether a party is an intended, or merely an incidental, third-party beneficiary.

{¶ 59} "Under this analysis, if the promisee * * * intends that a third party should benefit from the contract, then that third party is an 'intended beneficiary' who has enforceable rights under the contract. If the promisee has no intent to benefit a third party, then any third-party beneficiary to the contract is merely an 'incidental beneficiary,' who has no enforceable rights under the contract.

{¶ 60} " ' * * * [T]he mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract [is] insufficient; rather, the performance of that promise must also satisfy a duty owed by the promisee to the beneficiary.' " Id. at 40, 521 N.E.2d 780, quoting *Norfolk & W. Ry. Co. v. United States* (C.A.6, 1980), 641 F.2d 1201, 1208.

{¶ 61} In this case, BFP was the intended third-party beneficiary of the sales contract between Morbark and McCormick. Morbark knew that it was manufacturing the sawmill for BFP's ultimate use and McCormick purchased the sawmill from Morbark only after he knew that BFP would purchase it from him. Morbark did not mass produce sawmills, it had manufactured only approximately one sawmill a year since the early 1990s, and knew exactly who the ultimate consumer of this sawmill would be and what BFP's needs and requirements were. Thus, it produced this specific sawmill for this specific consumer while knowing this specific consumer's needs. Clearly, Morbark intended that this sawmill would satisfy BFP's needs.

{¶ 62} Because Morbark was in privity of contract with BFP, BFP would be able to recover against Morbark under a theory of implied warranty in contract. Morbark's second assignment of error is meritless.

{¶ 63} In its third assignment of error, Morbark argues that the trial court erred when it failed to grant Morbark's motion for a new trial on damages. Morbark argues that the damages award was improper for six different reasons:

(1) BFP cannot recover consequential damages in the form of interest expenses and losses on the sale of equipment other than Morbark equipment because Morbark could not have foreseen such damages at the time of the sale, (2) any award of lost profits for the year 1996 was not supported by the evidence, (3) BFP cannot recover consequential damages from the interest and lease finance charges related to BFP's purchase of the sawmill as those costs would have been incurred regardless of the breach, (4) BFP could not recover damages related to its losses on the non-Morbark equipment because Morbark had no reason to contemplate the possibility of such losses at the time of the sale, (5) the amounts paid by Bobb's parents' company to BFP should not have been recoverable, and (6) BFP did not produce sufficient evidence to distinguish which portion of its losses should be allocated to Morbark and which portion of its losses should be allocated to other causes. Because of the similarity in Morbark's first and fourth arguments, we will address them together. Similarly, we will address Morbark's third and fifth arguments together. We conclude that it may have been improper for the jury to include the interest and lease finance charges BFP incurred when it purchased the sawmill and the amounts Bobb's parents loaned to BFP in its award of damages. However, the remaining damages support the jury's verdict and, therefore, this assignment of error is meritless.

{¶ 64} Although Morbark attacks six different, specific grounds upon which the jury could have based its award, it did not request jury interrogatories differentiating between the types of damages the jury was awarding. Morbark failed to request jury interrogatories explaining how the jury arrived at the amount of damages which it awarded. Proper jury interrogatories lead to " 'findings of such a character as will test the correctness of the general verdict returned and enable the court to determine as a matter of law whether such verdict shall stand.' " *Freeman v. Norfolk & W. Ry. Co.* (1994), 69 Ohio St.3d 611, 613–614, 635 N.E.2d 310, quoting *Bradley v. Mansfield Rapid Transit, Inc.* (1950), 154 Ohio St. 154, 160, 42 O.O. 221, 93 N.E.2d 672, overruled on other grounds, *Bahm v. Pittsburgh & Lake Erie Rd. Co.* (1966), 6 Ohio St.2d 192, 35 O.O.2d 307, 217 N.E.2d 217. Damages are a proper subject for jury interrogatories. *Berge*; 36 Ohio App.3d at 330, 736 N.E.2d 517. When a jury returns a verdict and the mental processes of the jury have not been tested by special interrogatories to indicate which of the issues, if any, was resolved in favor of the successful party, error with respect to one claim will be disregarded if another independent claim, free from prejudicial error, will support the verdict of the jury. *Wagner v. Roche Laboratories,* 85 Ohio St.3d at 460, 709 N.E.2d 162, quoting *H.E. Culbertson Co. v. Warden* (1931), 123 Ohio St. 297, 303, 175 N.E. 205. Thus, Morbark is limited to challenging the jury's verdict as a whole as being against the manifest weight of the evidence.

{¶ 65} The assessment of damages is within the province of the jury, and a reviewing court is not free to disturb the jury's award absent a finding of passion and prejudice or a conclusion that the award is manifestly out of line. *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 655, 635 N.E.2d 331. Pursuant to Civ.R. 59(A)(6), a new trial may be granted when, among other things, the jury's verdict is against the manifest weight of the evidence. In determining whether a judgment is against the manifest weight of the evidence, a court must review the record, weigh the evidence, consider the credibility of witnesses, and then, making all reasonable inferences, determine whether the judgment is supported by some competent, credible evidence going to all of the essential elements of the case. *Frankenmuth Mut. Ins. Co. v. Selz* (1983), 6 Ohio St.3d 169, 172, 6 OBR 227, 451 N.E.2d 1203; *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. Thus, the trial court's role when determining whether a jury's verdict is against the manifest weight of the evidence is to ensure, in its supervisory capacity, against a miscarriage of justice. *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 91–93, 52 O.O.2d 376, 262 N.E.2d 685. The decision to grant a new trial rests within the trial court's sound discretion and will not be reversed absent an abuse of that discretion. *Malone v. Courtyard by Marriott L.P.* (1996), 74 Ohio St.3d 440, 448, 659 N.E.2d 1242. An abuse of discretion connotes more than an error of law or judgment; it implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore*, 5 Ohio St.3d at 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 66} Before directly addressing Morbark's arguments, we note that BFP is entitled to recover both direct and consequential damages due to Morbark's breach of warranty. See R.C. 1302.88. Consequential damages include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise * * *." R.C. 1302.89(B)(1). Consequential damages, like all remedies provided under R.C. Chapter 1302, are to be liberally administered for the purpose of placing the aggrieved party in the same position it would have been in had the contract not been breached. *Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co.* (1983), 6 Ohio St.3d 436, 439, 6 OBR 480, 453 N.E.2d 683; R.C. 1301.06(A). Because the award of these damages is to be liberally administered, courts must reject "any doctrine of certainty which requires almost mathematical precision in the proof of loss." R.C. 1302.89, Official Comment 4. These damages may include the indirect costs a party injured by a breach of contract incurs as a result of the breach. *S & D Mech. Contrs., Inc. v. Enting Water Conditioning Sys., Inc.* (1991), 71 Ohio App.3d 228, 239, 593 N.E.2d 354. "[A]ny loss resulting from the breach may be recovered, and may be determined in any manner that is reasonable." *Mikesell v. Muskingum Livestock Sales Co.* (Oct. 15, 1996), 5th Dist. No. CT96–0002, at 3,

1996 WL 752550, citing *Gen. Motors Acceptance Corp. v. Grady* (1985), 27 Ohio App.3d 321, 325, 27 OBR 378, 501 N.E.2d 68. "'When an entire business is wrongfully interrupted and injured * * * the measure of damages is the decrease in volume traceable to the wrong, as reflected by loss of profits, expenses incurred or similar concrete evidences of injury.'" *World Metals, Inc. v. AGA Gas, Inc.* (2001), 142 Ohio App.3d 283, 288, 755 N.E.2d 434, quoting *Guntert v. Stockton* (1976), 55 Cal.App.3d 131, 143, 126 Cal.Rptr. 690, 697.

{¶ 67} Because of the manner in which BFP financed its operations, its eventual failure forced the financing company to auction off BFP's equipment at a loss. Furthermore, the financing company did not recoup all of its losses through the auction and BFP incurred interest on the remaining debt. Within this assignment of error, Morbark's first and fourth arguments contend that BFP could not recover those interest expenses and losses on the sale of its non-Morbark equipment because the evidence does not show that Morbark knew or should have known that BFP might incur those expenses if Morbark breached the contract.

{¶ 68} R.C. 1302.89(B) requires that consequential damages be foreseeable by the seller at the time of the sale before a plaintiff may recover those damages. *Duracote Corp. v. Goodyear Tire & Rubber Co.* (1983), 2 Ohio St.3d 160, 161–162, 2 OBR 704, 443 N.E.2d 184; see, also, R.C. 1302.89, Official Comments 2 and 3. However, R.C. 1302.89(B)(1) "requires only that consequences be foreseeable rather than being actually foreseen." *Arledge v. Braun* (June 25, 1990), 4th Dist. No. 1528, at 3, 1990 WL 104983, citing *Stephan's Machine & Tool v. D & H Machinery Consultants* (1979), 65 Ohio App.2d 197, 19 O.O.3d 155, 417 N.E.2d 579. For example, if the nature and price of the product the buyer purchases from the seller is such that, at the time of contracting, the seller has reason to know that the buyer would borrow money to purchase the product, then the interest on the loan used to purchase the equipment may be recovered as a consequential damage of the breach. *Architectural Identification, Inc. v. Am. Business Equip.* (Sept. 16, 1986), 10th Dist. No. 85AP–1048, 1986 WL 309.

{¶ 69} In *Architectural Identification*, the court found that the purchase price of the product, $23,591.91, and the nature of the product, a computer system, were sufficient to demonstrate that, at the time of contracting, the seller has reason to know that the buyer would borrow money to purchase the product. Similarly, in this case the retail price of the sawmill alone was $157,000. BFP's total purchase price was $302,550. It is reasonable to infer that Morbark would have reason to know at the time of the purchase that BFP would be financing the purchase of the sawmill. Furthermore, because there is evidence that Bobb talked with Sandborn prior to purchasing the sawmill, it is reasonable to infer that Morbark knew that this was a startup business and that a serious defect in

the sawmill could drive BFP out of business. Thus, it is a reasonable inference from the record that Morbark had "reason to know" that BFP would finance this purchase and would incur these interest charges.

{¶ 70} Additionally, it is reasonable to infer that Morbark knew that BFP could incur losses on related equipment, since it knew that BFP would need the related equipment. Morbark sold that same type of equipment itself and its employees had installed a number of sawmills around the world. Indeed, it had a sawmill on its premises that it had previously run as a sawmill business and still ran as a demonstration model. Clearly, Morbark knew what equipment was necessary to run a sawmill. Thus, any argument that BFP's losses on that equipment if the main component of the mill, the Morbark sawmill itself, was defective were not foreseeable by Morbark is meritless. Accordingly, this argument fails.

{¶ 71} Morbark next argues that the trial court erred in allowing the jury to consider lost profits as an element of damages since those damages were not supported by the evidence.

{¶ 72} "Lost profits may be recovered by the plaintiff in a breach of contract action if: (1) profits were within the contemplation of the parties at the time the contract was made; (2) the loss of profits is the probable result of the breach of contract; and, (3) the profits are not remote and speculative and may be shown with reasonable certainty." *Charles R. Combs Trucking, Inc. v. Internatl. Harvester Co.* (1984), 12 Ohio St.3d 241, 12 OBR 322, 466 N.E.2d 883, paragraph two of the syllabus.

{¶ 73} Both the existence and the amount of lost profits must be demonstrated with reasonable certainty to be recoverable. *Gahanna v. Eastgate Properties, Inc.* (1988), 36 Ohio St.3d 65, 521 N.E.2d 814, syllabus. A fact is "reasonably certain" if it is probable or more likely than not. *Hacker v. Mail* (June 24, 1996), 12th Dist. Nos. CA95–10–170, CA95–10–172 and CA95–10–175, at 3, 1996 WL 346628. In this case, the parties do not dispute the first two prongs of the *Combs* test. BFP was engaged in starting a new business and it is appropriate to assume it did so in order to make a profit. See *AGF, Inc.*, infra, at 183, 555 N.E.2d 634. In addition, any lost profits would have been related to Morbark's breach of its warranty. Accordingly, Morbark contends that BFP did not establish with reasonable certainty what those profits would have been.

{¶ 74} " 'The difficulty of proving lost profits varies greatly with the nature of the transaction.' " *AGF, Inc. v. Great Lakes Heat Treating Co.* (1990), 51 Ohio St.3d 177, 181, 555 N.E.2d 634, quoting Restatement of the Law 2d, Contracts (1981) 146, Section 352, Comment *b*. A new business must establish lost profits through the use of such evidence as expert testimony, economic and financial

data, market surveys and analyses, business records of similar enterprises, and any other relevant facts. Id. at paragraphs two and three of the syllabus.

{¶ 75} This court has previously denied lost profit damages when the proof offered is not of the type described in *AGF*. For example, in *DiGiacomo v. Westfield Cos.* (Dec. 7, 1999), 7th Dist. No. 96–CA–239, 1999 WL 1138580, the plaintiff produced no expert witnesses testimony as to lost profits, merely estimated the new business's daily business receipts, failed to offer any proof of the overhead costs of the business, and relied on his own self-serving testimony as to what amounts would be deducted from gross revenue to arrive at lost profits. This court determined that this did not prove the existence or amount of lost profits with reasonable certainty.

{¶ 76} In contrast, the appellate court found sufficient evidence to support an award of lost profits in *Rubbermaid, Inc. v. Hartford Steam Boilers Inspection Co., Inc.* (1994), 96 Ohio App.3d 406, 645 N.E.2d 116. In that case, Rubbermaid was introducing a new line of refuse containers; however, its ability to make those containers was hampered because the mold repeatedly broke. Rubbermaid attempted to recover business interruption insurance coverage from its insurance carrier. The insurer refused to give Rubbermaid the lost profits it was seeking, claiming that those profits were too speculative. The court disagreed with the insurer.

{¶ 77} "In this case, the product upon which Rubbermaid based its claim was newly developed and had been on the market for approximately a year and a half prior to the July breakdown. Rubbermaid presented the following evidence: (1) the sales record of the product from its beginning, which showed that the product's sales declined during the business interruption period; (2) the sales of the product to the fifteen biggest customers for 1987, 1988, 1989 and 1990; (3) forecasted sales; (4) how Rubbermaid sold its products; (5) an average 19 percent growth of sales for the entire refuse line in 1987, 1988, and 1989; (6) the 15.6 percent growth rate per year in sales to one significant customer; (7) the appropriation request for a second mold because capacity of the first mold was being exceeded; (8) how Rubbermaid recorded its perpetual inventory; (9) Rubbermaid was selling all of the product it could make and had customers waiting for the product; and (10) its need for a commercially reasonable inventory.

{¶ 78} "While Rubbermaid did not present evidence concerning actual lost sales to specific customers, construing the evidence most strongly in Rubbermaid's favor, we find that reasonable minds could come to more than one conclusion as to whether Rubbermaid suffered business interruption losses. Thus, the trial court did not err in denying [the insurer]'s motion for a directed verdict." Id. at 410–411, 645 N.E.2d 116.

{¶ 79} In this case, BFP's expert, Phillip Ruppel, a certified public accountant who was asked to calculate BFP's losses, testified that BFP suffered lost profits of $385,600 for the approximate year BFP was operational. This conclusion was based upon the following facts which were introduced into the record: BFP planned on producing approximately ten million board feet a year of lumber and a market existed for its product; the average selling price per board feet of lumber; the cost of goods sold as demonstrated both by the history of Bobb's parents' sawmill and a publication which contained figures averaging the cost of goods sold for sawmills of comparable size nationally; and the general and administrative expenses of sawmills as demonstrated by that same publication.

{¶ 80} A new business must base its claim of lost profits on expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and any other relevant facts. *AGF*, supra. In this case, Ruppel was an experienced accountant without any particular ties to the lumber industry. The figures he used in his calculations coincide both with those experienced in that industry, such as BFP's lumber broker, and with sawmills of comparable size nationally, as demonstrated by the publication Ruppel relied upon. Because these facts demonstrate that the figure Ruppel arrived at is more probable than not, BFP demonstrated its lost profits with reasonable certainty.

{¶ 81} In its third argument within this assignment of error, Morbark asserts that BFP cannot recover the interest and financing charges incurred in obtaining the sawmill because they are not the proximate result of the breach. Then, in its fifth argument within this assignment of error, it argues that the trial court erred when it allowed the jury to award damages for money given by Bobb's parents' company to BFP. We do not address the substance of these arguments because, as stated above, Morbark never requested jury interrogatories related to damages and we cannot know what the jury included in its calculation of damages. Because we conclude that the other forms of damages the jury could have awarded to BFP support the jury's verdict, we will uphold its verdict regardless of the merits of these arguments.

{¶ 82} In its last argument within this assignment of error, Morbark claims that BFP presented insufficient evidence for the jury to allocate damages between Morbark and McCormick and, thus, the jury's award are unduly speculative and are barred as a matter of law. " 'Evidence of damages must be shown with a reasonable degree of certainty and speculative damages are not recoverable.' " *Glenwood Homes, Ltd. v. State Auto Mut. Ins. Co.* (Oct. 1, 1998), 8th Dist. No. 72856, at 6, 1998 WL 685493, quoting *Williams v. Ohio Exposition Comm.* (Mar. 31, 1988), 10th Dist. No. 87AP–733, 1988 WL 37103. However, as demonstrated above, BFP has proven its damages with a reasonable degree of certainty. It is not the fact that damages should be awarded which Morbark

wishes to challenge with this argument. Rather, Morbark disagrees with how the jury allocated the damages between the two wrongful parties. Clearly, allocation of fault is a question of fact for the jury. See *O'Connell v. Chesapeake & Ohio RR. Co.* (1991), 58 Ohio St.3d 226, 569 N.E.2d 889. The question Morbark poses to this court is whether the jury's allocation of damages is against the manifest weight of the evidence. As stated above, a judgment supported by competent, credible evidence is not against the manifest weight of the evidence. *Frankenmuth,* supra.

{¶ 83}   In this case, although Bobb testified that 80 percent of the problems were Morbark-related and 20 percent of the problems were non-Morbark-related, he did not testify that 80 percent of the damages were the result of Morbark-related problems and 20 percent of the damages were the result of non-Morbark-related problems. Rather, it was left to the jury to decide how the problems BFP experienced led to the damages it suffered. Given the evidence in this case, it was reasonable for the jury to conclude that the biggest reason BFP was forced out of business was its inability to cut straight lumber. BFP's lumber broker testified that BFP's customers refused to accept any more lumber from BFP. Furthermore, Roosa testified that the majority of the problems were the result of the faulty sawmill. Finally, there is ample evidence on how problems with the sawmill could lead to thick and thin lumber. There is no evidence on how the ancillary, non-Morbark equipment could have led to thick and thin lumber. When viewing the evidence in this light, there is competent, credible evidence supporting the jury's finding that the vast majority of the damages were the result of Morbark's breach of warranty. Therefore, this argument also fails.

{¶ 84}   After reviewing the evidence, we find that the jury's verdict was not against the manifest weight of the evidence. The losses BFP incurred, both directly and indirectly, from Morbark's breach exceed $1 million. Thus, the trial court did not abuse its discretion when it refused to grant Morbark a new trial on damages and Morbark's third assignment of error is meritless.

{¶ 85}   For the foregoing reasons, each of Morbark's assignments of error is meritless. The decision of the trial court is affirmed.

Judgment affirmed.

VUKOVICH, P.J., and GENE DONOFRIO, J., concur.