AGF, INC., APPELLEE, *v.* GREAT LAKES HEAT TREATING COMPANY, APPELLANT.

[Cite as AGF, Inc. *v.* Great Lakes Heat Treating Co. (1990), 51 Ohio St. 3d 177.]

(No. 89-685—Submitted April 3, 1990—Decided June 6, 1990.)

*Thompson, Hine & Flory, Leslie W. Jacobs, Stephen H. Daniels* and *Virginia S. Brown,* for appellee.

*Mansour, Gavin, Gerlack & Manos Co., L.P.A., Jeffrey M. Embleton, Eli Manos* and *Dan A. Morell, Jr.,* for appellant.

ALICE ROBIE RESNICK, J. This case presents two issues for our determination: (1) whether appellant (buyer) provided appellee (seller) with adequate notice required by R.C. 1302.65(C)(1) so as to preserve a claim for breach of express warranty; and (2) whether appellant, a new business, may recover lost profits. An overview of the contractual relationship between the parties is beneficial to our determination of these issues.

Norman R. Fisher, Jr. gained experience in the field of heat treating by working with his father, who owned a heat treating company. In 1979, Fisher developed a plan to establish his own business — Great Lakes Heat Treating Company, appellant herein. He entered into negotiations with a sales representative from appellee AGF for the purchase of an automated heat treating furnace capable of processing five hundred to five hundred twenty pounds of parts per hour. By letter dated August 3, 1979, Fisher accepted a proposal on behalf of Great Lakes, purchasing a "284 Shaker Hearth Furnace." The furnace was delivered on January 31, 1980. The furnace, however, could not be assembled due to improperly fitting parts. AGF was informed of the problem, and a technician was dispatched to Great Lakes. After additional complaints by Great Lakes and several adjustments, the furnace was finally assembled.

The furnace continued to fail to operate in spite of the assembly by AGF's technician. As the court of appeals succinctly stated, "[t]his failure of operation was only the beginning of a continuous failure of the furnace to operate and/or process 500 pounds of parts per hour. Numerous complaints

were lodged by appellant-G.L. [Great Lakes] with regard to the improper operation of the furnace and appellee-A.G.F. attempted to rectify the operating problems on at least six occasions. At one point, appellant-G.L.'s furnace was closed down for a period of two weeks in order to completely rebuild the furnace. Even this attempt at repair, however, failed to allow the furnace to function as originally designed at the rate of 500 pounds of parts per hour."

I

The first issue we must decide is whether appellant provided adequate notice to appellee so as to preserve its claim for breach of an express warranty. The applicable statute is R.C. 1302.65, wherein it is stated:

"(C) Where a tender has been accepted:

"(1) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of the breach or be barred from any remedy[.]"

R.C. 1302.65 is a codification of UCC 2-607. Official Comment 4 to UCC 2-607 provides: "The content of the notification need merely be sufficient to let the seller know that the transaction is troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection (Section 2-605 [R.C. 1302.63]). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Article [R.C. Chapter 1302] need only be such

as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation."

While the Official Comments to UCC 2-607 supply courts with interpretative assistance, we have recently noted that "[t]he Official Comment following R.C. 1302.65 [UCC 2-607] provides somewhat contradictory guidance as to how the notice requirement is to be construed." *Chemtrol Adhesives, Inc.* v. *American Mfrs. Mut. Ins. Co.* (1989), 42 Ohio St. 3d 40, 52, 537 N.E. 2d 624, 636. The debate as to whether a strict or liberal approach should be applied to UCC 2-607 persists. See Reitz, Against Notice: A Proposal to Restrict the Notice of Claims Rule in U.C.C. § 2-607(3)(a) (1988), 73 Cornell L. Rev. 534; Note, Effective Notification of Breach Under Uniform Commercial Code (1983), 44 U. Pitt. L. Rev. 733 ; Clark, First Line of Defense in Warranty Suits: Failure to Give Notice of Breach (1982), 15 U.C.C. L. J. 105; Dillsaver, Notice of Breach After Acceptance of Tender (1985), 17 U.C.C. L. J. 220; and Note, Notification of Breach Under Uniform Commercial Code Section 2-607(3)(a): A Conflict, A Resolution (1985), 70 Cornell L. Rev. 525.

This issue, however, has been decided by *Chemtrol, supra,* wherein we stated: "We reject the strict reading of R.C. 1302.65(C)(1) [and UCC 2-607] * * * as we believe that notice may be sufficient under the statute despite the fact that the notice does not specifically allege a breach of the contract. Moreover, in our view, the statute was not meant to exclude the possibility that notice may be inferred. See, *e.g., Crest Container Corp.* v. *R.H. Bishop Co.* (1982), 111 Ill. App. 3d 1068, 1077, 445 N.E. 2d 19, 26 (visits by employee of defendant manufac-

turer during which he observed product's failure to operate, combined with prior requests for service by the buyer, constituted notice to manufacturer)." *Id.* at 54, 537 N.E. 2d at 638. Therefore, no specific form or words are required in the notice of breach of contract under R.C. 1302.65(C)(1).

The record in this case clearly demonstrates that appellant was in constant and continual communication with appellee regarding the ability of the furnace to perform properly. Moreover, the record contains at least eight letters sent by appellant to appellee concerning the failure of the furnace to operate properly or to operate at all. The first in this series of correspondences is dated March 20, 1980, wherein Fisher set forth a detailed list of fifteen problems appellant was experiencing with the furnace. This letter was updated and followed by letters dated March 24, 25, 26, and 31, 1980. Each of these communications either delineated a new problem with the furnace or expressed concern over a continuing problem. There came a time when Fisher indicated that Great Lakes would reject the furnace, but was asked not to do so by the AGF salesman. The president of AGF, Frank Korzeb, flew from the corporate headquarters in New Jersey to Cleveland to inspect the furnace. As a result, the contract for sale was modified so that Great Lakes would be credited with $20,000 for the problems it was experiencing with the furnace, provided Great Lakes paid $100,000 on the account. This agreement was memorialized in a letter written by Fisher and dated April 2, 1980. The furnace still continued to experience problems. In a letter dated August 11, 1980, Fisher once again informed Korzeb that the furnace was not operating properly even after various repairs performed by appellee's technicians. Subsequent letters were sent by Fisher, all relaying the same basic message that the furnace was simply not functioning properly. As a result, appellant refused to remit payment of the balance due on the sale of the furnace, this refusal being the predicate for the instant action.

Although none of the above communications contained an express recitation that appellant considered the failure of the furnace to operate properly to be a breach of contract, we believe appellant has provided appellee with ample notice under R.C. 1302.65. A buyer need not employ any magic words or a specific statement to preserve its claim for breach of an express warranty. Under the applicable standard in this state, we conclude that the letters and oral communications provided appellee with sufficient notice under R.C. 1302.65(C)(1). Moreover, "* * * we stress the well-established rule that the 'determination of a reasonable time and the adequacy of notice to the seller are ordinarily questions of fact.' * * *" *Chemtrol, supra,* at 51-52, 537 N.E. 2d at 636. (Citations omitted.) Therefore, it was error for the trial court to direct a verdict as to the breach of the express warranty claim. See *Strother* v. *Hutchinson* (1981), 67 Ohio St. 2d 282, 284-285, 21 O.O. 3d 177, 179, 423 N.E. 2d 467, 469.

## II

The second issue presented for this court's determination concerns the ability to recover lost profits as consequential damages when the party seeking said damages is involved in a new business. Appellant argues that the trial court erred in excluding evidence of lost profits solely because the aggrieved party was a new business. Moreover, appellant contends that the court of appeals erred in the same manner by holding that "the state of

Ohio has consistently held that a new business cannot recover lost profits."

The general test in the state of Ohio for the recovery of lost profits is set forth in *Charles R. Combs Trucking, Inc.* v. *Internatl. Harvester Co.* (1984), 12 Ohio St. 3d 241, 12 OBR 322, 466 N.E. 2d 883, at paragraph two of the syllabus: "Lost profits may be recovered by the plaintiff in a breach of contract action if: (1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty." We further expounded on the third prong of the *Combs* test, stating that "[i]n order for a plaintiff to recover lost profits in a breach of contract action, the amounts of lost profits, as well as their existence, must be demonstrated with reasonable certainty. * * *" *Gahanna* v. *Eastgate Properties, Inc.* (1988), 36 Ohio St. 3d 65, 521 N.E. 2d 814, syllabus.

Restatement of the Law 2d, Contracts (1981) 146, Section 352, Comment *b*, states as follows: "The difficulty of proving lost profits varies greatly with the nature of the transaction. If, for example, it is the seller who claims lost profit on the ground that the buyer's breach has caused him to lose a sale, proof of lost profit will ordinarily not be difficult. If, however, it is the buyer who claims lost profit on the ground that the seller's breach has caused him loss in other transactions, the task of proof is harder. Furthermore, if the transaction is more complex and extends into the future, as where the seller agrees to furnish all of the buyer's requirements over a period of years, proof of the loss of profits caused by the seller's breach is more difficult. If the breach prevents the injured party from carrying on a well-established business, the resulting loss of profits can often be proved with sufficient certainty. Evidence of past performance will form the basis for a reasonable prediction as to the future. See Illustration 5. *However, if the business is a new one or if it is a speculative one that is subject to great fluctuations in volume, costs or prices, proof will be more difficult. Nevertheless, damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like.* See Illustration 6."[1] (Emphasis added.)

As can be seen from the foregoing, the drafters of the Restatement recognized that lost profits may be recovered by a new business provided adequate proof is submitted by the new business. In addition, Official Comment 2 to UCC 2-708 (R.C. 1302.82) provides support for this proposition,

---

[1] Illustrations 5 and 6 to Comment *b* state as follows at 147:

"5. A contracts with B to remodel B's existing outdoor drive-in theatre, work to be completed on June 1. A does not complete the work until September 1. B can use records of the theatre's prior and subsequent operation, along with other evidence, to prove his lost profits with reasonable certainty.

"6. A contracts with B to construct a new outdoor drive-in theatre, to be completed on June 1. A does not complete the theatre until September 1. Even though the business is a new rather than an established one, B may be able to prove his lost profits with reasonable certainty. B can use records of the theatre's subsequent operation and of the operation of similar theatres in the same locality, along with other evidence including market surveys and expert testimony, in attempting to do this."

wherein it is stated: "* * * [t]his section permits the recovery of lost profits in all appropriate cases * * *. It is not necessary to a recovery of 'profit' to show a history of earnings, especially if a new venture is involved." While R.C. 1302.82 relates to a seller's damages for non-acceptance or repudiation of goods, the recognition of recovery for lost profits available to a seller warrants the conclusion that this remedy must also be available to a buyer.

Therefore, we adopt the position taken under the Restatement of Contracts 2d, Section 352, Comment *b,* and expressly recognize that a new business may recover lost profits, so long as the buyer provides a sufficient quantum of proof.[2] Other jurisdictions follow this approach. See *Super Valu Stores, Inc.* v. *Peterson* (Ala. 1987), 506 So. 2d 317, 327 ("[A]nticipated profits of an unestablished business [may be recovered], if proved with reasonable certainty."); *Short* v. *Riley* (App. 1986), 150 Ariz. 583, 585, 724 P. 2d 1252, 1254 ("[W]hen evidence is available to furnish a reasonably certain factual basis for computation of probable losses, recovery cannot be denied even though a new business venture is involved."); *W.W. Gay Mechanical Contractor, Inc.* v. *Wharfside Two, Ltd.* (Fla. 1989), 545 So. 2d 1348, 1351 ("A business can recover lost prospective profits regardless of whether it is established or has any 'track record.'"); *Olivetti Corp.* v. *Ames Business Systems* (1987), 319 N.C. 534, 546, 356 S.E. 2d 578, 585 ("While we agree * * * that lost future profits are difficult for a new business to calculate and prove, we are persuaded that there should be no *per se* rule against the award of such damages where they may be shown with the requisite degree of certainty. Accordingly, we hold, along with what appears to be a majority of jurisdictions reaching the issue, that the new business rule is not the law of our state."); *Drews Co.* v. *Ledwith-Wolfe Associates* (1988), 296 S.C. 207, 210, 371 S.E. 2d 532, 534 ("[N]ew business rule [should be viewed] as a rule of evidentiary sufficiency rather than an automatic bar to recovery of lost profits by a new business."); *Harsha* v. *State Savings Bank* (Iowa 1984), 346 N.W. 2d 791, 798 ("The new business rule is not absolute. If factual data are presented which furnish a basis for compilation of probable loss of profits, evidence of future profits should be admitted and its weight, if any, should be left to the jury."); *Chung* v. *Kaonohi Center Co.* (1980), 62 Hawaii 594, 606, 618 P. 2d 283, 291 ("[W]here a plaintiff can show future profits in a new or unestablished business with reasonable certainty, damages for loss of such profits may be awarded."); *Fera* v. *Village Plaza, Inc.* (1976), 396 Mich. 639, 242 N.W. 2d 372 (Although future profits as an element of damages may be more possible to prove with reasonable accuracy with regard to an "interrupted

---

[2] "Recent cases have eroded the once generally accepted rule that lost profits damages for a new business were not recoverable. The development of the law has been to find damages for lost profits of an unestablished business recoverable when they can be adequately proved with reasonable certainty. The earlier cases are either ignored or rationalized as having been based on a finding that on those particular facts the evidence was inadequate as a matter of law to support a judgment for the plaintiff. What was once a rule of law has been converted into a rule of evidence." Dunn, Recovery of Damages for Lost Profits 3d (1987) 220, Section 4.2.

business" as opposed to a "new business," new business may recover anticipated lost profits for breach of contract.).

In Ohio, therefore, a new business may recover lost profits in a breach of contract action but such lost profits must be established with reasonable certainty. In determining whether a plaintiff has met this burden, we see no reason to depart from the general test for lost profits set forth in *Combs, supra*. Thus, we will apply the tripartite analysis of *Combs* to the facts of this case.

The first prong requires a consideration of whether the parties contemplated profits at the time the contract was made. Appellant was engaged in establishing a new business, and it is appropriate to assume it did so in order to make a profit. Likewise, from the very start of negotiations for the sale of the furnace, both parties demonstrated an awareness that the new business would be profit oriented. Thus, appellant satisfies this aspect of the *Combs* test.

The second prong necessitates an inquiry as to whether the lost profits are the probable result of the breach of contract. The record overwhelmingly demonstrates that any lost profits were the direct result of the furnace's constant and continual failure to operate as was anticipated. In fact, the record discloses that the furnace *never* operated at the capacity as stated in the original proposal between the parties (five hundred pounds of parts per hour). Therefore, appellant satisfies the second prong.

The third factor requires that profits must not be too remote or speculative, and that they be shown with reasonable certainty. As noted previously, both the existence and the amount of lost profits must be demonstrated with "reasonable certainty." *Gahanna, supra*. Further, as discussed previously, Restatement of Contracts 2d, Section 352, Comment *b* provides that "* * * damages [lost profits] may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys. and analyses, business records of similar enterprises, and the like."[3] By utilizing these methods a new business may, under the appropriate circumstances, demonstrate lost profits with reasonable certainty. Therefore, we hold that a new business may establish lost profits with reasonable certainty through the use of such evidence as expert testimony, economic and financial data, market surveys and analyses, business records

---

[3] "In one sentence, both the new-business rule and its corollary, that an earnings history is required to project profits (see 4.6), are thrown out the window.

"* * *

"* * * The trend in the cases since 1978, is unmistakable. The modern decisions cited in this section demonstrate an increasing rejection of the traditional new-business rule.

"* * * It is impossible for anyone, including an appellate court, to foresee all the possible situations in which meritorious claims could be asserted for lost profits even though the business to which those profits might accrue had not yet commenced operation. Nor is any worthwhile end to be achieved by permitting one party to breach his contracts with impunity — giving him an option, as it were — because the other party has not yet commenced operation. The trend of the modern cases is plainly toward replacing the old rule of law with a rule of evidence — the unquestionable principle that damages for loss of profits must be proven with reasonable certainty and that the evidence must support that finding by trier of fact." Dunn, *supra*, at 227-228, Section 4.2.

of similar enterprises, and any other relevant facts.

In the case at bar, appellant offered the following evidence as to this issue: (1) testimony of a customer, (2) testimony from a certified public accountant, and (3) testimony of Norman Fisher, president of appellant Great Lakes. The customer, Robert Steinheiser, Vice-President of Sales at Triad Metal Products, testified that "we agreed to give * * * [appellant] everything * * * [appellant] could handle." Additionally, Steinheiser stated that he could "very easily" provide appellant with enough work to run the furnace twenty-four hours a day, seven days a week. However, the witness did not provide any further specificity as to the price or quantity of parts. Charles M. Ciuni, a certified public accountant, testified that he had reviewed financial statements and other documents from a company in a similar type of business, as well as industry statistics from a recognized textbook in this area. Ciuni's opinion testimony was then proffered as to what he believed appellant's lost profits would have been. Lastly, Fisher testified, on proffer, that the average price appellant received per part was twenty cents. Fisher then stated that the loss of profit suffered by appellant was $39,000 per month, using the simple calculation of subtracting expenses from expected revenues based on the average price of a single part.

We conclude that appellant has not demonstrated his lost profits with the required "reasonable certainty." Ciuni cannot be considered an expert witness on the business in question. Moreover, his opinion testimony was without proper foundation and none of the records, documents or sources he used was ever offered as evidence. Additionally, while Ciuni testified that he examined business records of similar companies involved in this line of work, none of these was introduced into evidence. Likewise, Steinheiser provided no specific quantities of either work already performed or work to be performed in the future. Nor did this witness indicate any type of price for the work. Lastly, appellant has not submitted any of its own business records to substantiate its claims for lost profits. We note that "* * * evidence of lost future profits as an item of compensatory damages need only be reasonable, not specific." *Combs, supra* at 244, 12 OBR at 325, 466 N.E. 2d at 887. In this case, however, appellant has failed to provide adequate evidence to meet this standard.

In conclusion, while new businesses may recover lost profits as damages for breach of contract, such damages must be demonstrated with reasonable certainty. Appellant did provide appellee with sufficient notice under R.C. 1302.65, and thus had preserved its claim for breach of express warranty. However, based upon the evidence presented, appellant has not demonstrated lost profits with reasonable certainty. We therefore affirm the decision of the court of appeals, albeit for different reasons, and uphold the jury verdict.

*Judgment accordingly.*

Moyer, C.J., Holmes, Wright and H. Brown, JJ., concur.

Sweeney and Douglas, JJ., concur in part and dissent in part.

Douglas, J., concurring in part and dissenting in part. I concur in paragraphs one, two and three of the syllabus. I concur in the judgment of

the majority with regard to R.C. 1302.65. I respectfully dissent from the majority's judgment with regard to the loss-of-profits issue. It is my judgment that the loss of profits was prop- erly documented and proven in the trial court.

SWEENEY, J., concurs in the foregoing opinion.