NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0918n.06

No. 14-3041

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Dec 10, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ASK CHEMICALS, LP, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| COMPUTER PACKAGES, INC., | ) | DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |
| | ) | |

---

BEFORE: BOGGS, CLAY, and GILMAN, Circuit Judges.

BOGGS, Circuit Judge: Plaintiff-Appellant ASK Chemicals (ASK), the assignee of a now-expired Japanese patent, appeals the district court's award of summary judgment to the defendant, Computer Packaging, Inc. (CPI), in a breach-of-contract suit claiming damages resulting from CPI's failure to maintain the patent on ASK's behalf. The district court granted CPI's motions to exclude the report of ASK's sole expert witness and for summary judgment. ASK appeals both the exclusion of the expert report and the grant of summary judgment. For the reasons set forth below, we affirm.

1

I

This case concerns the possible damages owed by defendant CPI to ASK for CPI's breach of contract when CPI failed to pay the amounts required under Japanese law to maintain ASK's Japanese Patent No. 3,278,168 (the '168 patent).

In 1997, Ashland, a chemical company, applied for a Japanese patent to protect the method by which it produced a particular type of riser sleeve that was unique in its employment of a "cold-box" manufacturing process. Riser sleeves are used throughout the foundry industry to improve the quality of metal castings. As the liquid metal cools in the hollow of a casting, it solidifies and shrinks. The last part of the casting to cool within the hollow will often form a void where remaining shrinkage occurs. The result is a defective metal casting. Riser sleeves, essentially metal reservoirs external to the casting, prevent this potential defect by providing additional liquid metal during cooling so that voids form in the riser, not in the casting itself.

The '168 patent issued on April 30, 2002 and was assigned by Ashland to ASK on November 30, 2010.

A version of the riser sleeve, ASK's "Exactcast" riser sleeve, is covered by a number of European and American patents. Although Exactcast riser sleeves have sold successfully in both the Americas and Europe, ASK's (and its predecessor's) efforts in Japan were less fruitful: a factory fire in 2003 put an end to its initial penetration of the Japanese market and ASK did not again focus on Japan until 2008, when it began developing Japanese clients, a long and arduous process requiring the commitment of significant time, effort, and money. At the time the '168 patent lapsed, ASK had no sales of related technology in Japan.

The parties do not dispute the basic facts regarding the assignment of the patent, the lapse of the patent, or the cause of its lapse. The sole issue before the district court was the question of what damages CPI might owe to ASK for the breach.

Ashland, while still the holder of the '168 patent, had hired CPI to pay the annual fees due on its patents in Japan. After the assignment of the '168 patent to ASK, CPI continued in its role maintaining the patent. Had the patent been properly maintained under Japanese law, it would have expired on March 21, 2017. But the patent was not maintained. CPI failed to make the ninth necessary payment, due in January 2010. Six months later, at the end of Japan's statutory grace period, the patent lapsed irretrievably.

On July 20, 2012, ASK filed a complaint against CPI in the United States District Court for the Southern District of Ohio, requesting compensatory, direct, expectancy, and prospective damages under two counts: breach of contract and breach of implied-in-fact contract. CPI filed an answer on April 5, 2012, in which it admitted that it had failed to pay the required fees and that, as a result of its failure, the patent lapsed. Following the completion of discovery, CPI submitted two contemporaneous motions: (1) to exclude the report of ASK's expert witness, Brian Russell, and (2) for summary judgment.

Following briefing and oral argument, the district court granted CPI's motion to exclude the report proffered by ASK's sole expert witness. The district court subsequently granted CPI's motion for summary judgment. It held that, in the absence of the report, there were no further issues of material fact for a jury, and ASK had failed to demonstrate with reasonable certainty the amount of lost profits resulting from the breach of contract. ASK timely appealed.

II

This court reviews the district court's exclusion of the testimony of an expert witness, as it reviews all evidentiary rulings, for abuse of discretion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997); *Pride v. BIC Corp.*, 218 F.3d 566, 575 (6th Cir. 2000). The district court abuses its discretion when it "relies on clearly erroneous findings of fact, improperly applies the law, or employs an erroneous legal standard." *Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 748 (6th Cir. 2005) (internal quotation marks and alterations omitted).

We review the district court's grant of summary judgment de novo. *See Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 933 (6th Cir. 2000). District courts may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing a movant's claim to summary judgment, the court draws all justifiable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Though the moving party bears the initial burden of showing that there is no genuine dispute of material fact, after the movant makes such a showing, the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial. *Id.* at 256.

III

On appeal, ASK advances two issues. First, it argues that the district court erred in granting CPI's motion to exclude the expert testimony of Brian Russell because his methods were unreliable. Second, ASK argues that the district court erred in granting summary judgment to CPI because, even if Russell's report was properly excluded, ASK still presented sufficient evidence to withstand summary judgment.

4

A

The district court granted CPI's motion to exclude the expert report of Mr. Russell because, although the court decided that he was qualified as an expert, it also found his report to be insufficiently reliable.

Testimony of expert witnesses is governed by Rule 702 of the Federal Rules of Evidence. Rule 702 allows an expert witness to provide testimony in opinion form if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Rule 702, in concert with other Rules of Evidence, empowers the district court to ensure that the expert's testimony is both relevant and reliable. *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993). The court plays this same gatekeeping function even if the expert's opinion is "technical," rather than scientific, in nature. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). This line of cases governing the district court's screening of experts seeks to "strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009).

Though the court found that Mr. Russell had sufficient specialized knowledge to offer evidence as an expert, it found that the other requirements of Rule 702 were not satisfied. Rule 702(b) requires that an expert's opinion be "based on sufficient facts or data." Fed. R. Evid. 702(b). Rule 702(c) requires that the expert's testimony is the product of both "reliable principles and methods." Fed. R. Evid. 702(c). As the *Daubert* Court articulated, the district

5

court must concentrate "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. However, "[a] district court is not required to admit expert testimony 'that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1977)) .

In *Nelson*, this court found such an analytical gap. The plaintiff proffered the testimony of a board-certified neurologist and psychologist regarding the neurological effects that result from exposure to a particular chemical. Although the magistrate judge found that the neurologist was properly credentialed to serve as an expert witness, the magistrate judge correctly refused to admit the expert's opinion because "the methodology by which [the expert] reached his opinion concerning causation [was not] found reliable." *Nelson*, 243 F.3d at 254. The court determined that, although the tests used to assess exposure to the chemicals were generally accepted, the expert "admitted no knowledge concerning the actual exposure of the . . . plaintiffs . . . or the temporal relationship between their exposure and symptoms." *Ibid*. Because the leap between the limited data and the expansive conclusion in the doctor's testimony was too great for the evidence to be reliable, we determined that the judge did not abuse his discretion in excluding the doctor's testimony.

The situation in this case is similar to that in *Nelson*. The district court found that the experience, education, and professional qualifications of ASK's witness, Russell, properly qualified him as an expert. Like the magistrate judge in *Nelson*, the district court here did not balk at the witness's expert credentials, but only at his methods. The district court in this case found that Russell based his calculations on fundamentally flawed data and impermissible

6

methods. Russell determined the amount of lost profits, in part, from a marketing plan that ASK produced a decade-and-a-half ago, which only covered the years 1998 to 2003, and from which he extrapolated future lost profits during the years 2013 to 2022—all without explaining his method or assumptions. Russell also relied on ASK's 2011 global-market analysis, which estimated the riser-sleeve markets of various regions of the world, including Asia, but that did not provide data about Japan specifically. Thus, according to the district court, it could not serve as a reasonable basis to estimate profits in Japan. For Russell to have demonstrated lost profits to a reasonable certainty he would have required, at a minimum, the following data: "(1) the size of the Japanese riser sleeve market; (2) ASK's market penetration; (3) ASK's sales; and (4) ASK's direct costs." In the absence of these basic, objective figures, any projection or calculation made by Russell of future lost profits would, like the calculations of the neurologist with no direct knowledge of patient exposure in *Nelson*, involve "too great an analytical leap." *See Nelson*, 243 F.3d at 254.

Of course, "an expert may rely on otherwise inadmissible hearsay evidence in forming his opinion if the facts and data upon which he relies are of a type reasonably relied upon by experts in his field." *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997). But Russell's wholesale adoption of Plaintiff's estimates, without revealing or apparently even evaluating the bases for those estimates, goes beyond relying on facts or data and instead cloaks unexamined assumptions in the authority of expert analysis. "As 'gatekeeper,' the trial judge is imbued with discretion in determining whether or not a proposed expert's testimony is admissible, based on whether it is both relevant and reliable." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)). On the facts of this case, and particularly in light of the unreliability

of the evidence underlying Plaintiff's estimates, the district court was within its discretion to determine that the lack of independent verification or analysis of the revenue projections rendered Russell's opinion unreliable. Where an expert merely offers his client's opinion as his own, that opinion may be excluded. *See, e.g.*, *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 677 (S.D.N.Y. 2011) (rejecting expert testimony based on "the conclusory statements of [the party's management] and not on his independent evaluation of the facts"); *King-India Forge, Inc. v. Millennium Forge, Inc.*, No. 1:07-cv-00341-SEB-SML, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009) ("When an expert's proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded.").

Given the unreasonableness of Russell's methods, the faulty and incomplete data upon which they were based, and the general unreliability of the evidence, the district court did not abuse its discretion in excluding Russell's testimony.

B

The district court granted summary judgment to CPI, holding that, in the absence of Russell's expert report, there was insufficient evidence on the record to create a genuine dispute of material fact.

Under Ohio law, consequential damages, including damages for lost profits, are available in suits for breach of contract. A plaintiff can recover lost profits if it can show that "(1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of the profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty." *City of Gahanna v. Eastgate Props., Inc.*, 521 N.E.2d 814, 817 (Ohio 1988). However, in order for a plaintiff to recover lost profits,

8

"the *amount* of the lost profits, as well as their existence, must be demonstrated with reasonable certainty." *Id.* at 818 (emphasis added). In other words, damages are not awarded merely on a plaintiff's assertion "that it would have made a particular amount of profits, but [the plaintiff] must prove lost profits with calculations based on facts." *UZ Engineered Prods. Co. v. Midwest Motor Supply Co., Inc.*, 770 N.E.2d 1068, 1083 (Ohio Ct. App. 2001).

We do not address the question of whether lost-profits damages *never* may be proven by comparison to a plaintiff's performance in an existing market. But in the case of ASK's complaint, neither of the first two elements is in doubt. Profits were certainly in the contemplation of the parties at the time the contract was made—CPI was, after all, in the business of administering the patent-management programs of intellectual-property owners. Similarly, there is no dispute over the second element, causation. If ASK had suffered lost profits as the result of the lapse of the '168 patent, it would have been because of CPI's (admitted) failure to pay the required annual payment.

The parties dispute only the final requirement, that the lost profits be shown to a "reasonable certainty." In demonstrating lost profits, Ohio law does not require plaintiffs to prove the amounts lost with absolute precision. The evidence "need only be reasonable, not specific." *Charles R. Combs Trucking, Inc. v. Int'l Harvester Co.*, 466 N.E.2d 883, 887 (Ohio 1984). But demonstrating lost profits to a reasonable certainty requires the use of detailed evidence, for example, "expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like." *AGF, Inc. v. Great Lakes Heat Treating Co.*, 555 N.E.2d 634, 640 (Ohio 1990) (citing Restatement (Second) of Contracts § 352, cmt. b). The evidence submitted must be sufficient to support calculations establishing the amount of lost profits: "Unless the figure is supported by calculations based on facts available or

9

in evidence, the courts will properly reject it as speculative or uncertain." *Endersby v. Schneppe*, 596 N.E.2d 1081, 1084 (Ohio 1991).

A review of four Ohio cases—one of which established lost profits and three of which did not—demonstrates what constitutes non-speculative, reasonably certain lost profits. First, lost profits were awarded under Ohio law in *Michigan Millers Mut. Ins. Co. v. Christian*, 794 N.E.2d 68 (Ohio Ct. App. 2003), a case in which the evidence demonstrated the amount of lost profits to a reasonable certainty. Among the types of evidence were testimony regarding market conditions, records of company earnings during the time period in question, records of company earnings during identical periods in the preceding years, and compilations of customer receipts and business transaction records. *Id.* at 77. From this evidence, a simple computation comparing the profits of one period with the profits of another period at the same time of year in the same location in the same enterprise allowed the establishment of lost profits to a reasonable certainty.

Second, and in contrast, in *Homes by Calkins*, the plaintiff failed to demonstrate lost profits to a reasonable certainty because the claim was necessarily unprovable and speculative. In a suit for damages based on a vendor's failure to have a deed restriction removed, the plaintiff, a real-estate developer, was delayed in building a development by the 11 months necessary to clear the property's title following sale. Reviewing his evidence, the trial court found, and the Court of Appeals of Ohio affirmed, that since neither the plaintiff nor the court "could reasonably estimate how many units [the plaintiff] could have sold, if it could have sold any," the plaintiff failed to demonstrate lost profits to a reasonable certainty. *Homes by Calkins, Inc. v. Fisher*, 634 N.E.2d 1039, 1045 (Ohio Ct. App. 1993). Since the demonstration of lost profits in a new business is necessarily more speculative, such demonstrations "*receive greater scrutiny*

10

because there is no track record upon which to base an estimate." *Andrew v. Power Mktg. Direct, Inc.*, 978 N.E.2d 974, 992 (Ohio Ct. App. 2012).

Third, in *Ace Vending Co. v. Davidson*, 457 N.E.2d 341 (Ohio Ct. App. 1982), the plaintiff failed to demonstrate its lost profits to a reasonable certainty because the evidence it submitted was based on an inapposite comparison. Ace Vending had several vending machines that were unlawfully detained after the closing of the pizzeria in which they were installed. The evidence submitted consisted of little more than the testimony of Ace Vending's office manager as to the average amount of money per week made by the machines during the last two months the pizzeria was open. Since the pizzeria had gone out of business, however, the court rejected this evidence because, following the pizzeria's closing, the lost profits would necessarily have been limited to the amount of money that the machines would have made *at another location* had they been timely returned. *Ace Vending*, 457 N.E.2d at 343.

Finally, in *Kosier v. DeRosa*, 862 N.E.2d 159 (Ohio Ct. App. 2006), the court found that the plaintiff failed to demonstrate lost profits where his calculations lacked necessary data. In a suit for breach of contract to install new flooring into a house, the plaintiff submitted evidence as to his labor costs, but provided no information as to how many hours of work would have been required to complete the contract. The Ohio Court of Appeals held that, in the absence of such evidence, it was not possible to establish the amount of profits lost to a reasonable certainty. *See Kosier*, 862 N.E.2d at 166.

In this case, ASK's evidentiary submissions suffer from each of the defects outlined in the three Ohio cases above. Like the plaintiff in *Homes by Calkin*, ASK had no track record of riser-sleeve sales in Japan aside from the decade-old effort that had been abandoned following the factory fire. The lack of any reliable track record subjects ASK's lost-profits calculations to

11

stricter inquiry and increases the difficulty of determining a reasonably accurate figure for lost profits. Though ASK had again taken the initial steps necessary to reintroduce their riser sleeves into Japan (they sought certification from several potential clients and sold test products), they still had almost no sales history and thus any attempt to demonstrate lost profits using riser-sleeve sale projections alone would suffer from a lack of hard data.

ASK's evidence was also like that in *Ace Vending* because it sought to establish profits in the Japanese market based on an inapposite comparison with sales in Europe and North America. Having provided sales figures only for North America and Europe and providing virtually no relevant market research on Japan, ASK sought to establish potential future sales and profits by analogizing sales in one region of the world with potential sales in another. Such extrapolation, without more, is insufficient to establish lost profits to a reasonable certainty.

Lastly, ASK's evidentiary submissions appear to suffer from the same basic fault as in *Kosier* because the submissions lacked necessary data. As the plaintiff in *Kosier* failed to provide one of the basic elements necessary to its calculations (the number of hours of labor performed), ASK has failed to give basic data about the Japanese market that would be necessary to make reasonably certain projections of potential future profits. As the district court pointed out, without data on the size of the Japanese market or ASK's sales and direct costs, it would be virtually impossible to settle on a figure for ASK's lost profits.

Were the demonstration of the *existence* of lost profits all that was necessary to overcome a motion for summary judgment, ASK may have had success. Based on the evidence submitted, a jury could very well find that ASK had lost profits because of CPI's breach. On appeal, ASK provides a painstaking roster of all the evidence placed in the record, including marketing surveys, its 1998 marketing plan, its regional market-share calculations, European and American

12

licenses, and projections of capital costs for the building of a new factory. However, since there is no way that the evidence submitted could lead a court to determine the *amount* of lost profits to a reasonable certainty, there is no genuine dispute of material fact for a jury. ASK's evidentiary submissions, even though voluminous, do little to establish a specific sum necessary to meet the standard of a "reasonable certainty." *See City of Gahanna*, 521 N.E.2d at 817.

## IV

For the reasons above, we AFFIRM the judgment of the district court.

CLAY, Circuit Judge, concurring. I agree with the majority that Plaintiff did not put forward sufficient evidence to permit a reasonably certain determination of its damages. I write separately because I believe Ohio law requires a more precise consideration of the proofs than the analysis offered by the majority.

In particular, I take exception to the suggestion in the majority opinion that a company in Plaintiff's position, or any company prevented from entering a new market, would face a "stricter inquiry" in proving its damages. Ohio law allows even entirely new businesses to proceed under the "general test . . . for the recovery of lost profits" and expressly recognizes that such businesses may prove their damages through circumstantial evidence. *AGF, Inc. v. Great Lakes Heat Treating Co.*, 555 N.E.2d 634, 638 (1990).

I also write separately in order to clarify the circumstances in which I believe a plaintiff may prove lost profits damages by comparison to its performance in another market. Proof of lost profits poses an inescapably hypothetical question, as the Ohio Supreme Court recognized in *AGF*, and thus inevitably requires a degree of estimation. *See id.* A plaintiff's track record of successful performance in other markets is a source of reliable and pertinent data that I believe in many cases will strengthen the certainty of damages calculations. *Cf. MindGames, Inc. v. W. Pub. Co.*, 218 F.3d 652, 654-55 (7th Cir. 2000) (a track record of successful sales of past games could allow the creator of a board game to establish lost profits with sufficient certainty). Indeed, in a similar case, the United States Supreme Court approved evidence of lost profits based on a market comparison similar to the approach urged by Plaintiff here. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 116 and n.11, 123-25 (1969) (accepting estimates that the plaintiff would have achieved a 16% market share in Canada absent the breach where the estimates were based on a comparison of the plaintiff's sales in the US).

14

Nonetheless, I believe that Plaintiff in this case has not introduced sufficient evidence to allow a factfinder to determine damages with a reasonable degree of certainty and therefore concur in the judgment. I would affirm the exclusion of Russell's expert report solely because, as the majority explains, it unquestioningly accepts Plaintiff's projections about the sales and market share the company would have achieved in Japan and dresses up those unsupported estimates in the authority of an expert analysis. I find the remaining evidence put forward by Plaintiff inadequate to allow a factfinder to calculate damages with any reasonable degree of certainty for a single, narrow reason: Plaintiff has inexplicably failed to support its estimates about the Japanese riser sleeve market with any data, analysis, or expert opinion. Instead, it relies on a single-page, undated spreadsheet with "guesses" as to the market share and sales volume of its three competitors in Japan. Without more, a factfinder would be unable to translate Plaintiff's successful track record in North America and Europe into any reasonable projection of sales and profits that Plaintiff could have achieved in Japan.

## 1. Exclusion of the Expert Report

Although I agree with the majority that Russell's report should be excluded because it uncritically accepts and relies on Plaintiff's own revenue projections, I part ways with the majority when it suggests that Russell was remiss for failing to include and rely on "basic, objective figures" like Plaintiff's "market penetration," "sales," and "direct costs" in Japan. Maj. Op. at 7. The majority argues that without these figures "*any* projection or calculation" of lost profits would be too speculative to meet the standards for expert testimony. *Id.* (emphasis added). This reasoning sets up an impossible hurdle in a case like the present one, where by definition the measure of damages is a counterfactual: what profits would Plaintiff have earned had Defendant not breached the contract? I perceive nothing in Federal Rule of Evidence 702

15

that prevents an expert from offering such an estimate or projection, so long as it is supported by sufficient, albeit circumstantial, facts and data. *See*, *e.g.*, *Andler v. Clear Channel Broadcasting, Inc.*, 670 F.3d 717, 727-29 (6th Cir. 2012) (holding that the district court erred in excluding expert testimony that would have provided projections of the plaintiff's lost earning capacity based on a statistical average salary); *Multimatic, Inc. v. Faurecia Interior Systems USA, Inc.*, 358 F. App'x 643, 650-51 (6th Cir. 2009) (relying on expert's testimony rejected projected lost profits and indicating that the expert "had a reasoned, non-speculative basis" for his projections where his data "came from a reliable industry forecaster").

For the same reason, I cannot agree with the majority's suggestion that it would be improper for Russell to rely on the 2011 global market survey setting out sales and market share for Plaintiff and its competitors in various regional markets. The data in that document, while not sufficient standing alone to support a computation of lost profits, is circumstantial evidence relevant to estimating the sales and market share Plaintiff may have achieved in Japan absent Defendant's breach, and could justly be relied on by the expert.

The principal shortcoming in Russell's report, in fact, is that he did *not* rely on the 2011 global market survey or similar sources to generate a projection of Plaintiff's probable sales, market share, and royalties, but instead unquestioningly adopted Plaintiff's own revenue estimates and used those estimates as the basis for his calculations.

### 2. Summary Judgment

Under *AGF*, *supra*, Plaintiff is entitled to rely on circumstantial data to support its lost profits damages. *See* 555 N.E.2d at 638 (holding that a new business venture may establish lost profits damages "with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the

16

like."). The majority opinion, however, asserts that because "ASK had no track record of riser-sleeve sales in Japan aside from the decade-old effort that had been abandoned following the factory fire," it lacks a "reliable track record" and therefore will face a "stricter inquiry" into its lost profits calculations. Maj. Op. at 12. The majority also writes that because Plaintiff "had almost no sales history" in Japan, "any attempt to demonstrate lost profits . . . would necessarily suffer from a lack of hard data." *Id.* This analysis proves little, however, because any new business would lack a sales history, and yet under Ohio law, that business may recover lost profits. *See* 555 N.E.2d at 638-39. Moreover, it strikes me as odd to suggest that Plaintiff lacks a "reliable track record" or any relevant "sales history" when it successfully competes in at least two other regional markets selling the same product it would have sold in Japan.

I believe the majority too casually rejects the most reliable source of circumstantial data Plaintiff could rely on—the company's performance in the riser sleeve markets of other parts of the world. *See* Maj. Op. at 12 (suggesting that "analogizing sales in one region of the world with potential sales in another . . . . without more, is insufficient to establish lost profits to a reasonable certainty."). I believe such cursory treatment of the comparative evidence to be unwarranted. Because I am concerned that the majority opinion treats this issue without adequate precision, I will briefly set out my own analysis here.

Courts have rightly recognized that "some degree of speculation is permissible in computing damages, because reasonable doubts as to remedy ought to be resolved against the wrongdoer." *MindGames, Inc. v. W. Publ'g Co. Inc.*, 218 F.3d 652, 658 (7th Cir. 2000) (internal citation and quotation omitted) *quoted in Telxon Corp. v. Smart Media of Del., Inc.*, 2005-Ohio-4931, 2005 WL 2292800 at *44 (Ohio Ct. App. 2005). *See also* Restatement (Second) of Contracts § 352, cmt. a ("Doubts are generally resolved against the party in breach.").

17

Nonetheless, Ohio law prudently limits speculation by requiring that "[a] plaintiff may not merely assert that it would have made a particular amount of profits, but must prove lost profits with calculations based on facts." *UZ Engineered Prods. Co. v. Midwest Motor Supply Co., Inc.*, 770 N.E.2d 1068, 1083 (Ohio Ct. App. 2001). *See also Endersby v. Schneppe*, 596 N.E.2d 1081, 1084 (Ohio 1991) ("Unless the figure is substantiated by calculations based on facts available or in evidence, the courts will properly reject it as speculative and uncertain.").

For this reason, to the extent that the majority opinion suggests that proof of lost profits by reference to Plaintiff's successful record in other markets, as a method, is unlikely to meet the standards of "reasonable certainty," I respectfully disagree. To the contrary, comparative evidence—whether drawn from the plaintiff's performance in another market, the experience of another company in the same market, or from a past business venture of the plaintiff—can improve the certainty of a computation of lost profits by anchoring the projected profits to a body of empirical fact. *See Zenith Corp.*, 395 U.S. at 116, 124-25 (accepting evidence from plaintiff's performance in other markets); *AGF*, 555 N.E.2d at 638 n.1 (suggesting that records from similar businesses in the same locality can be used to prove a company's lost profits); *MindGames*, 218 F.3d at 658 (stating that a successful track record in prior endeavors may furnish a basis for estimates of probable sales lost due to a defendant's breach).

*Zenith Corp.*, *supra*, is illustrative. In that case, the Supreme Court considered a damages award based on a patent pool's anti-competitive conduct in denying Zenith licensing agreements that would have facilitated its sales of radios and television sets in Canada. 395 U.S. at 114-18. The evidence included a computation of damages, prepared by Zenith's experts, that "reflect[ed] a comparison between Zenith's percentage share of the United States television market . . . and

18

Zenith's actual share of the Canadian market during the same period." *Id.* at 116 n.11. The Supreme Court soundly advised that

> [t]rial and appellate courts alike must . . . observe the practical limits of the burden of proof which [may] be demanded of a . . . plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.

*Id.* at 123. The Court held Zenith's evidence—including testimony that the breach "prevented its securing a share of the market comparable to that which it enjoyed in the United States, and which its business proficiency, demonstrated in the United States, dictated it should have obtained in Canada"—supported an award of damages. *Id.* at 124-25.

Of course, "[a] comparison of two different markets will always be open to the argument that the markets are fundamentally incomparable, like apples and oranges." *Rose Confections, Inc. v. Ambrosia Chocolate Co.*, 816 F.2d 381, 394 n.7 (8th Cir. 1987). However, where there is a reasonable basis for comparing the markets, in the interest of allowing the factfinder to consider relevant evidence that might limit undue speculation in the calculation of lost profits, I believe that the differences should be reserved "for the jury to weigh." *See id.*

I believe Plaintiff's track record of successful sales, market share, and royalties in North America and Europe may be validly used to estimate the revenues it could have achieved in Japan. The fact that the respective markets are for the same product, riser sleeves, used for the same industrial purposes, is a sufficient basis for comparing them. The comparable nature of the three markets is further demonstrated by the presence of one of Plaintiff's principal competitors in each. In order to translate Plaintiff's success in other regions into projections of lost profits in Japan, however, a factfinder would need a minimum quantum of basic information about the

19

Japanese riser sleeve market, such as its size. Plaintiff's evidence about the Japanese market is inadequate to allow such a projection to be calculated with reasonable certainty.

Plaintiff heavily relies on a document that it describes as a "market survey" of the Japanese riser sleeve market. Plaintiff relies on the numbers in that document to describe the total size of the Japanese riser sleeve market, to estimate the share of that market it could achieve, and ultimately to calculate the revenues it would have received. This purported "survey," however, is nothing more than a single page document setting out supposed sales and market share for Plaintiff's three competitors in Japan from 2008 to 2010. The document is undated, leaving it unclear if the numbers are intended as forecasts or estimates of past sales. The sales numbers are prominently described by the column heading, "Guess." (R. 46-12, "Japanese Survey," filed under seal.) The market share numbers also appear to be rough estimates. According to Plaintiff's 30(b)(6) deposition testimony, because there are no industry groups that collect and provide data on the riser sleeve market in Japan, the numbers in this purported survey are "educated guesses" based on "market intelligence." (R. 35-4, ASK Deposition, p. 187, under seal).) Finally, nothing in the document speaks to the market for a license to produce the Exactcast technology by any of Plaintiff's competitors.

Although I am sympathetic to the challenges Plaintiff faces in marshalling evidence about the riser sleeve market in Japan, an undated document revealing acknowledged guesses with no justification for those guesses is simply not enough to support a "reasonably certain" computation of the profits Plaintiff could have achieved in Japan. Instead of confronting the challenge head-on and putting before the court the bases for its estimates of the Japanese market, including any testimony or data relevant to or corroborative of its calculations, Plaintiff instead asks us to rely, essentially, on its say-so. These proofs fail to meet the requirement that a

plaintiff "prove lost profits with calculations based on facts." *See UZ Engineered Prods.*, 770 N.E.2d at 1083.

**Conclusion**

In sum, while I disagree with the reasoning in the majority opinion, I believe that it reaches the correct result. Therefore, I concur in the judgment.